O’Connor, J.
{¶ 1} This appeal requires us to examine issues concerning the extent that the admission into evidence of records of scientific tests (such as DNA reports) in a criminal trial implicates the Confrontation Clause of the Sixth Amendment to the United States Constitution. Our precedent in State v. Craig, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, strongly supports the conclusion that the DNA reports in this case are not “testimonial” as that term is defined in Crawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. Furthermore, although there is a split of authority among other jurisdictions on the issues we resolve, the better-reasoned cases hold that records of scientific tests like those involved here are not “testimonial.” We therefore reverse the judgment of the court of appeals.
*370 I
{¶ 2} On April 10, 2004, Esta Boyd’s body was found in the bedroom of her home in Marion. The crime scene was bloody; the coroner found that Boyd had suffered multiple blows to the head, which caused subarachnoid hemorrhaging. He estimated that she had been dead for one to three days when found. A witness testified that when he had talked to Boyd at around 7:30 or 8:00 on the evening of April 7, Boyd told him that she was “sitting there talking to Lee.” Defendant-appellee, Lee Crager, was an acquaintance of Boyd; Crager’s father and Boyd were close friends. The last person to hear from Boyd spoke to her at around 8:45 on April 7.
{¶ 3} By the time Boyd’s body was discovered, Crager was already in jail. He had been arrested on April 8, 2004, at around 8:30 p.m. for failing to pay his bill at Mikey’s Pizza. The arresting officer reported that Crager was intoxicated and had blood on his pants and on one of his knuckles. On April 10, 2004, officers went to the Multi-County Correctional Center to recover Crager’s clothing and to photograph him. Crager had cuts on the knuckles of his right hand and scratches on the inner portion of his right forearm.
{¶ 4} Laboratory testing on Crager’s shirt revealed that it contained human blood stains, which contained Boyd’s DNA. Testing conducted on a ring worn by Boyd revealed the presence of Crager’s DNA. Cigarette butts found in an ashtray in Boyd’s bedroom contained Boyd’s and Crager’s DNA.
{¶ 5} Other evidence pointed to Crager’s presence in Boyd’s home. Two palm prints from Crager were found on a mirror in Boyd’s bedroom, and his thumb print was found on a beer can recovered from her home. A witness testified that he had seen Crager walking toward Boyd’s house at about 5:00 p.m. on April 7. Detectives discovered that the last phone call made from Boyd’s phone had been made to the Marion Area Counseling Center. The Marion Area Counseling Center had received a call from Crager between 11:30 a.m. and 12:30 p.m. on April 8.
{¶ 6} Evidence established that the killer likely was in Boyd’s house for a significant period of time. Phone records indicated that Boyd’s phone was used to call phone sex-line numbers on April 8 at 3:54 a.m., 10:04 a.m., 1:04 p.m., 1:06 p.m., and 1:08 p.m. There were a number of empty beer cans and an empty whiskey bottle found in the building, but testimony established that Boyd rarely drank alcoholic beverages. There were 22 cigarette butts in an ashtray in Boyd’s bedroom, but testimony revealed that Boyd generally did not permit smoking in her house.
{¶ 7} The case proceeded to a jury trial. Based on the way this case comes to us, the state’s presentation of DNA evidence at trial is the focal point for *371 resolving the issues presented. Therefore, we recount the way that evidence was presented in considerable detail.
{¶ 8} The state introduced the DNA evidence in its case against Crager through the testimony of DNA expert Steven M. Wiechman of the Bureau of Criminal Identification and Investigation (“BCI”). Jennifer Duvall, the DNA analyst who prepared the two DNA reports at issue, was on maternity leave at the time of trial and did not testify.
{¶ 9} Shortly before the state called Wiechman to the witness stand, Crager’s defense attorney moved, outside of the presence of the jury, to prevent Wieehman from testifying regarding any DNA evidence. Counsel argued solely that Wiechman’s testimony was hearsay because “Mr. Wiechman did not conduct the testing, he did not remove any samples to be tested, he did not do the actual calculations. * * * I don’t see how he can testify to what someone else did.”
{¶ 10} As the record makes evident, defense counsel’s opposition to Wiechman testifying was solely based on hearsay grounds, not on the Confrontation Clause. Furthermore, counsel did not object to the admission into evidence of the DNA reports themselves, but argued only that Wiechman should not be permitted to testify because he was not the DNA analyst who actually performed the tests and signed the report.
{¶ 11} In response, the prosecutor asserted that the DNA reports were business records and that Wiechman did a “technical review” of Duvall’s work to ensure “the integrity of the process.” The prosecutor further argued that, as with any other business record, when “someone * * * makes a documentation, another witness can testify to it because it’s done in the normal and ordinary course of business.” The trial court denied defense counsel’s motion and allowed Wiechman to testify, stating, ‘You can ask him — ask Mr. Wiechman anything you want about ‘these aren’t your calculations’, I will give you plenty of leeway on that.”[1]
{¶ 12} Wiechman testified as to his qualifications, education, training, and experience as a DNA expert. He stated that Crager’s trial was the 36th time that he had testified as an expert witness and that he had conducted DNA testing for “hundreds of cases.” He testified about the history and fundamentals of DNA testing and described safeguards in place to ensure the accuracy of all DNA *372 tests done at BCI, including a requirement that each analyst must pass a “proficiency test” twice a year, which involves analyzing a special test sample, drawing conclusions, and then submitting the test sample results to be evaluated for accuracy. Wiechman further testified that BCI is accredited by the American Society of Crime Laboratory Directors, Laboratory Accreditation Board.
{¶ 13} Wiechman then explained the DNA testing review process that BCI does in every case: “Once a case is completed by an analyst it is actually gone through [sic] two review processes. One is a technical review process, and the other is an administrative process. With regards to the technical review, another qualified analyst would actually check the work of another analyst to determine whether they followed all the correct procedures, whether they agree with their case approach, anything that that analyst did, another analyst would look at and would have to agree with, and then in turn sign off on that particular case.
{¶ 14} “Once that is completed there is what’s called an administrative review which a Supervisor would look at a case and basically make sure there [are] no mistakes, that pretty much everything has been followed. Then once those two review processes have been done, then the case actually goes out the door and is sent to a requesting agency. But on 100 percent of the cases that is what is done.”
{¶ 15} Wiechman stated that the review process is in place to ensure accuracy and reliability. “Mistakes can be made, typos can be made. But to have those safeguards in place insures that there’s reliability within those results.” Wiechman testified that in some circumstances DNA testing “can be quite lengthy depending upon what you’re looking at.” He further stated that DNA testing is not done on every item of evidence, “[b]ecause of the volume of cases that we get, and because of so many requests. It’s virtually impossible to test every single stain on every piece of evidence. It’s just not only inefficient as far as case approach goes, but it’s also very costly.”
{¶ 16} Wiechman testified that each case from the state includes a “case synopsis,” which explains “what happened in the case and what questions does the [Police] Department have, and what they’re trying to answer with regard to the physical evidence that they have submitted.” BCI personnel also consult with law enforcement and “sometimes the Prosecutor” to identify the information that “will be of use to us to help guide us in determining what samples to look at, and that’s what was done in this particular case.” Furthermore, there is “give and take” between BCI and the requesting agency as to what is tested, and “ultimately it’s the Prosecutor’s decision on what we’ll actually look at.”
{¶ 17} Wiechman informed the jury that in this case BCI conducted DNA testing at law enforcement’s request. He stated that he was not the analyst who did the testing, but that Duvall did the testing and he “technically reviewed it.”
*373 {¶ 18} Wiechman testified that his technical review of Duvall’s work involved reviewing her notes, the DNA profiles she generated, her conclusions, and the final report, which consisted of “all the findings that she had within this case. I actually technically reviewed that and made sure that the decisions or conclusions that she came up with were consistent and were supported by her work that she did.”
{¶ 19} Wiechman stated that when he did the technical review, he did not know when the case would be tried or that he would be testifying. He explained his review of the DNA “profiles” by stating:
{¶ 20} “The profiles that are generated on the knowns and unknowns are basically what we call electrophrerograms, they’re basically charts. From those charts there’s actually a sheet that [the analyst] determines what the profile is. I will, in turn, once she has completed her analysis I will, in fact, independently verify the correct calls that she made, or if she said ‘this is what the profile is’, I will actually go back and verify yes, in fact, she made the correct calls or correct decision on what this profile was.”
{¶ 21} Wiechman stated that he had looked at the same data Duvall looked at and that he had come to the same conclusions. In response to a question regarding the procedure for resolving a possible discrepancy, Wiechman testified:
{¶ 22} “If there’s a discrepancy between the technical reviewer and the analyst, then they can get together and meet and say, ‘Okay, I think this’ or ‘I think this’, and then if a consensus still isn’t reached there then it can actually either go to — • what we have is a Forensic Science Coordinator, or another person that can be consulted, or it can actually go to the supervisor who will in turn say, ‘Okay, yes, I believe that this person is correct or this interpretation is correct or you’re both right’ and you can come to a consensus that way.” Wiechman stated that there were no discrepancies in this case.
{¶ 23} Wiechman’s testimony then focused on two “rounds” of DNA testing, both of which were done by Duvall, which resulted in two separate DNA reports. State’s Exhibit 56 was the first report, detailing the results of testing done on a stain on Crager’s shirt that revealed Boyd’s DNA. Wiechman testified that the frequency of occurrence of Boyd’s DNA profile was “1 in 1.028 quintillion people.” State’s Exhibit 57 was the second, later, report, detailing the results of testing done on Boyd’s ring and on cigarette butts taken from the victim’s bedroom. Testing of the ring revealed Crager’s DNA. Wiechman testified that the frequency of occurrence of the DNA found on the ring was one in 7.8 million people. Testing of the cigarette butts also revealed Crager’s DNA. Wiechman testified that the frequency of occurrence of the DNA found on one of the cigarette butts was one in 13.7 quadrillion people.
*374 {¶ 24} On cross-examination, Wiechman stated that he “actually technically reviewed the second [round of testing], but in preparation for court I reviewed, unofficially to prepare for testimony, I reviewed the entire case file.” He agreed with defense counsel’s statements that DNA testing is limited to revealing “what something is * * * and perhaps who it came from” and cannot reveal “how it got there.” Wiechman further elaborated:
{¶ 25} “All I can say is that this particular DNA profile is on this particular piece of evidence, and this person may or may not have contributed that stain or that profile. * * * I guess in general terms you can’t really say ‘okay, this DNA got on this particular item in this particular time’ or even within a certain window. All you can say [is] ‘this is what I found, it’s consistent with these people’ or ‘not consistent with these people. Here are my conclusions’, and that’s what we report.”
{¶ 26} On redirect, Wiechman stated that the purpose of a DNA test is not to match a particular individual: “The test is just to produce a profile. When you actually do the comparison, that is when you determine whether or not a person may or may not have contributed to that stain.” Further, “[y]ou have no idea when you’re doing the analysis if you’re gonna get one person, if you’re gonna get two, if you’re gonna get three. I’ve had cases where you get lots of people in a particular stain. You just don’t know until you actually do the analysis. When you sit down and do your interpretation of the data and then make the comparison between the knowns and the unknowns. Then you can determine ‘yes, this came from a person that’s consistent with this person, it’s not consistent with that person’. That’s actually after you do the physical bench work. Then you sit down and you interpret your data. * * * [T]he actual data is presented in the report and then there’s paragraph form data that actually explains what that data means.”
{¶ 27} On recross, Wiechman explained the extent of the DNA testing that yielded the DNA of only two persons (Boyd and Crager) on the items tested. In response to defense counsel’s questions, Wiechman explained that the “synopsis” provided by whoever requests testing, which sets forth the details of the case, does not dictate the results: “I make that determination [that the DNA was consistent with Boyd and Crager] based on the data that I have, that it supports that conclusion that it’s consistent with these two people. So although we take the synopsis into consideration, when we’re making our interpretation of the data, that’s when the conclusion is drawn. * * * [A]ll of the profiles obtained in this case could be explained with one interpretation, this interpretation in this case consistent with these two people.” Wiechman also stated that some items that could have been tested were not, because testing is done only on those items that are “requested to be tested.”
*375 {¶ 28} On final redirect, Wiechman clarified that the synopsis presented to BCI by law-enforcement personnel when they request testing is not a factor BCI’s experts rely on in reaching their determinations: “The interpretation is made based upon the data that’s obtained in the case. The synopsis is only to guide us and to help support the findings that we have.”
{¶ 29} The prosecutor then asked, “[I]f law enforcement said to you, ‘Hey, we are satisfied it’s Lee Crager, and that’s the only one person’s DNA we want you to look for’, would you do the test that way?” Wiechman responded:
{¶ 30} “No. * * * [W]e’re an unbiased agency. So we’re not looking for any one particular person. We’re saying ‘okay, these are the items that you’re requesting us to perform DNA analysis on, these are what we’ll do’. I have no idea what we have, we’ll present the evidence or the findings that we have, and if that’s sufficient then perhaps no other request will be made. If it’s not sufficient and they feel additional testing’s required, then they can request that. But at this time once we based our conclusions on the data that we had, based on those two rounds of testing, it was determined by [the prosecutor’s] office that that was sufficient for him, and that’s what was done.”
{¶ 31} Finally, in response to a question regarding whether the amount of DNA testing done in this case was “more or less than [is] typically done in similar cases,” Wiechman stated, “Depending on the complexity, this is probably about average.”
{¶ 32} At the conclusion of the jury trial, Crager was found guilty of aggravated murder and aggravated burglary. Upon Crager’s appeal, the court of appeals reversed the judgment of the trial court and remanded for further proceedings, concluding that the DNA report was testimonial and that Crager’s Sixth Amendment right to confrontation had been violated. Based on that determination, the court of appeals found other assignments of error moot and did not address them.
{¶ 33} This court accepted the court of appeals’ certification of a conflict and ordered the parties to brief the issue as stated in the court of appeals’ journal entry:
{¶ 34} “Are records of scientific tests, conducted by a government agency at the request of the State for the specific purpose of being used as evidence in the criminal prosecution of a specific individual, ‘testimonial’ under Crawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 1354 [158 L.Ed.2d 177]?” 109 Ohio St.3d 1421, 2006-Ohio-1967, 846 N.E.2d 532.
{¶ 35} In the case certified as being in conflict, State v. Cook, 6th Dist. No. WD-04-029, 2005-Ohio-1550, 2005 WL 736671, ¶ 19-20, the Sixth District Court of Appeals held that law-enforcement records of checks done on a breath-alcohol testing machine and of the qualifications of the officer who was the custodian of *376 those records were not testimonial under Crawford, because they bore “no similarities to the types of evidence the Supreme Court labeled as testimonial” and also because the records qualified as business records under Evid.R. 803(6), “which, at least according to dicta in Crawford, are not testimonial.”
{¶ 36} We also accepted a discretionary appeal, 109 Ohio St.3d 1423, 2006-Ohio-1967, 846 N.E.2d 533, on one of the state’s propositions of law, which asserts:
{¶ 37} “A criminal defendant’s constitutional right to confrontation is not violated when a DNA analyst testifies at his trial in place of the DNA analyst who conducted the DNA testing. Neither records which are admissible under the business records exception to the rule against hearsay nor expert testimony, are testimonial under Crawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 1354 [158 L.Ed.2d 177].”
II
{¶ 38} The starting point for our analysis is that the DNA reports admitted into evidence in this case were “business records,” under the hearsay exception of Evid.R. 803(6). The reports were made “from information transmitted by, a person with knowledge, [and are] kept in the course of a regularly conducted business activity,” and it “was the regular practice of that business” (BCI) to make the reports. Furthermore, the reports were introduced through the testimony of a “qualified witness” (Wiechman) and nothing suggests that the “method or circumstances of preparation indicate lack of trustworthiness.” See State v. Craig, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 81-82 (autopsy reports are business records).
{¶ 39} This case presents the issue whether the DNA reports, even though properly admissible as business records under the applicable exception to the hearsay rule, might nevertheless violate the Sixth Amendment to the United States Constitution, which provides that “[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.”
{¶ 40} Prior to the United States Supreme Court’s Crawford decision, the determination that the DNA reports were business records would have ended the inquiry under the Confrontation Clause and resulted in the conclusion that Crager’s right to confrontation was not violated. The Supreme Court had held in Ohio v. Roberts (1980), 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597, that an unavailable witness’s out-of-court statement against a criminal defendant was not barred by the Confrontation Clause if it bore adequate “indicia of reliability,” i.e., if it fell within a “firmly rooted hearsay exception,” or it bore “particularized guarantees of trustworthiness.” The DNA reports in this case, as Evid.R. 803(6) business records, satisfy the Roberts test.
*377 {¶ 41} However, Crawford overruled Roberts by establishing in its place a new and very different approach. In Crawford, 541 U.S. at 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177, the Supreme Court held that “testimonial” out-of-court statements presented in a criminal trial violate the Confrontation Clause unless the witness was unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. After Crawford, the key inquiry for Confrontation Clause purposes is whether a particular statement is testimonial or nontestimonial.
{¶ 42} The Crawford court stated, “Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law — as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.” Crawford at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177; see also State v. Muttart, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59 (only testimonial statements implicate the Confrontation Clause).
{¶ 43} Crawford noted that “not all hearsay implicates the Sixth Amendment’s core concerns,” id. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177, and that its holding did not apply to all hearsay, because many statements entered into evidence pursuant to hearsay exceptions are “not testimonial — for example, business records or statements in furtherance of a conspiracy,” id. at 56, 124 S.Ct. 1354, 158 L.Ed.2d 177. See also Davis v. Washington (2006), 547 U.S. 813, — 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (nontestimonial hearsay, “while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause”).
{¶ 44} The Crawford court, 541 U.S. at 51-52, 124 S.Ct. 1354, 158 L.Ed.2d 177, noted three “formulations” of a “core class” of testimonial statements: “ ‘ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,’ Brief for Petitioner 23; ‘extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,’ White v. Illinois, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); [and] ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,’ Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3.”
{¶ 45} In State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at paragraph one of the syllabus, this court adopted the third “formulation” to hold *378 that “[f]or Confrontation Clause purposes, a testimonial statement includes one made ‘under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’ ” Id., quoting Crawford. Stahl has no application here because Stahl involved the testimonial nature of actual oral “statements” of a declarant and did not involve records of scientific tests or the business-records exception to the hearsay rule.[2] Furthermore, as explained below, a statement is not “testimonial” merely because it may reasonably be expected to be introduced at a later trial, although that may be a proper consideration in certain other situations involving specific oral statements of a declarant.
{¶ 46} In State v. Craig, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, we concluded that the defendant’s Confrontation Clause rights were not violated when an autopsy report prepared by a doctor who did not testify at trial was entered into evidence, and a different doctor provided expert testimony about the autopsy after reviewing the report and supporting materials. As to the testifying doctor in Craig, this court held that her expert testimony did not violate the defendant’s right to confrontation, because the jury was fully aware that she had not personally conducted or been present at the autopsy and because the defense had the opportunity to question her “about the procedures that were performed, the test results, and her expert opinion about the time and cause of death.” Id. at ¶ 79. We further held that the autopsy report was properly admitted as a business record under Evid.R. 803(6). Id. at ¶ 80.
{¶ 47} We based our decision in Craig in part on the Crawford court’s statement that “business records are, ‘by their nature,’ not testimonial.” Craig, at ¶ 81, quoting Crawford, 541 U.S. at 56, 124 S.Ct. 1354, 158 L.Ed.2d 177. We reasoned: “An autopsy report, prepared by a medical examiner and documenting objective findings, is the ‘quintessential business record.’ Rollins v. State (2005), 161 Md.App. 34, 81, 866 A.2d 926. ‘The essence of the business record hearsay exception contemplated in Crawford is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are ‘by their nature’ not prepared for litigation.’ People v. Durio (2005), 7 Misc.3d 729, 734, 794 N.Y.S.2d 863.
{¶ 48} “Most jurisdictions that have addressed the issue under Crawford have found that autopsy reports are admissible as nontestimonial business or public records. See Moreno Denoso v. State (Tex.App.2005), 156 S.W.3d 166, 180-182 (autopsy report was not testimonial and was admissible without the deceased pathologist’s testimony); Durio, 7 Misc.3d at 734-737, 794 N.Y.S.2d 863 (autopsy *379 report was nontestimonial and its admission without the testimony of the medical examiner who performed the autopsy did not violate Crawford); State v. Cutro (2005), 365 S.C. 366, 378, 618 S.E.2d 890 (autopsy report was nontestimonial).
{¶ 49} “ * * *
{¶ 50} “We agree with the majority view under Crawford and conclude that autopsy records are admissible as nontestimonial business records.” Craig, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 82-83 and 88.
{¶ 51} The autopsy report at issue in Craig is not distinguishable from the DNA reports in this case. Like that autopsy report, the DNA reports here are nontestimonial. We reject the position that these DNA reports are different because the lab work that produced them was done at the request of the prosecution or because it was reasonably expected that the reports would be used in a criminal trial.
{¶ 52} Although BCI’s statutory mission under R.C. 109.52 is to “aid” law enforcement in solving crimes, BCI is not itself an “arm” of law enforcement in the sense that the word implies a specific purpose to obtain incriminating results. As the testimony of Wiechman detailed above demonstrates, although BCI conducts tests at the request of law-enforcement personnel or other entities affiliated with the state, BCI maintains its independence to objectively test and analyze the samples it receives.
{¶ 53} Furthermore, BCI’s analysis and testing are not intended to arrive at a predetermined result. If that were the case, then BCI would have no credibility and would be unable to maintain its accreditation. Rather, BCI’s testing can both include and exclude suspected potential donors from the DNA pool, as Wiechman’s testimony recounts. Therefore, there is nothing inherently untrustworthy about the tests conducted by BCI. We decline to create standards that would evaluate scientific tests conducted by BCI differently than we would evaluate similar tests conducted by a private laboratory. The same standards also should apply when the state wishes to use scientific tests conducted at the request of a criminal defendant against that defendant.
{¶ 54} Although it could have been reasonably expected that the DNA reports would be used in a criminal trial, that consideration was also present with the autopsy report in Craig. As in Craig, the scientific-test reports in this case were prepared in the ordinary course of regularly conducted business and so were not testimonial.
{¶ 55} We fully agree with those courts that have rejected arguments regarding the “testimonial” nature of scientific-test reports such as the DNA reports involved in this case.
*380 {¶ 56} In holding that serology reports were properly admitted even though the analyst who prepared the reports did not testify, the Supreme Court of North Carolina stated in State v. Forte (2006), 360 N.C. 427, 435, 629 S.E.2d 137: “Under the Supreme Court’s analysis [in Crawford ], the reports at issue here are not testimonial. They do not fall into any of the categories that the Supreme Court defined as unquestionably testimonial. These unsworn reports, containing the results of [the preparer’s] objective analysis of the evidence, along with routine chain of custody information, do not bear witness against defendant. * * * Instead, they are neutral, having the power to exonerate as well as convict. Although we acknowledge that the reports were prepared with the understanding that eventual use in court was possible or even probable, they were not prepared exclusively for trial and [the preparer] has no interest in the outcome of any trial in which the records might be used.”
{¶ 57} In People v. Brown (2005), 9 Misc.3d 420, 424, 801 N.Y.S.2d 709, the court reasoned:
{¶ 58} “The notes and records of the laboratory technicians who tested the DNA samples in this case were not made for investigative or prosecutorial purposes but rather were made for the routine purpose of ensuring the accuracy of the testing done in the laboratory and as a foundation for formulating the DNA profile.
{¶ 59} “ * * * [T]he notes of the many laboratory personnel who conducted the four steps of DNA profiling over several days were made during a routine, non-adversarial process meant to ensure accurate analysis and not specifically prepared for trial. Because DNA testing requires multiple steps done by multiple technicians over multiple days, all of the steps in the process must be documented for the benefit of supervisors and technicians who perform subsequent testing functions.”
{¶ 60} This case is very similar to People v. Geier (2007), 41 Cal.4th 555, 61 Cal.Rptr.3d 580, 161 P.3d 104, a recent decision of the Supreme Court of California. In a thorough and well-reasoned opinion, the Geier court specifically held that the DNA report at issue in that case was not testimonial for Confrontation Clause purposes and so the defendant’s Sixth Amendment rights were not violated by its admission into evidence. Id. at 607, 61 Cal.Rptr.3d 580, 161 P.3d 104.
{¶ 61} In Geier, the prosecution contracted with a private laboratory to conduct DNA testing. The prosecution’s DNA expert — -who did not personally conduct the testing but did sign the report as the supervisor of the biologist who did the actual testing — testified that in her opinion DNA extracted from vaginal swabs taken from the victim matched a sample of the defendant’s DNA. The defendant argued that the DNA expert’s testimony violated his Sixth Amendment confron *381 tation right pursuant to Craioford because the expert’s opinion was based on testing that the expert did not personally conduct. Id. at 593-594, 61 Cal.Rptr.3d 580, 161 P.3d 104.
{¶ 62} The defendant in Geier further argued that under Crawford, the DNA report that was the basis of the expert’s testimony was testimonial “because it was a statement ‘made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’” Geier, 41 Cal.4th at 598, 61 Cal.Rptr.3d 580, 161 P.3d 104, quoting Crawford, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. The Geier court stated the issue as “whether the admission of scientific evidence, like laboratory reports, constitutes a testimonial statement that is inadmissible unless the person who prepared the report testifies or Crawford’s conditions — unavailability and a prior opportunity for cross-examination — are met,” and then observed that courts disagree as to the answer. Id.
{¶ 63} The court noted that some courts adopt a bright-line test concluding that because scientific-test evidence (whether it be fingerprint analysis, autopsy reports, serology reports, drug-analysis reports, or DNA reports) is prepared for possible use in a criminal trial, it is “testimonial” under Crawford. As typical examples of this position, the court cited State v. Caulfield (Minn.2006), 722 N.W.2d 304, and Las Vegas v. Walsh (2005), 121 Nev. 899, 124 P.3d 203; and also the decision of the court of appeals below in this case: State v. Crager, 164 Ohio App.3d 816, 2005-Ohio-6868, 844 N.E.2d 390. Geier, 41 Cal.4th at 599, 61 Cal.Rptr.3d 580, 161 P.3d 104.
{¶ 64} The Geier court then noted that other courts have held that scientific-test evidence is not testimonial, even if it was prepared for possible use at trial. Some courts base this conclusion on indications within Crawford that such evidence does not implicate the abuses the Confrontation Clause is meant to prevent, and other courts rely on Crawford’s comments that “business records” generally are not within the scope of Confrontation Clause concerns. Id.
{¶ 65} The Geier court concluded that “[t]hese more nuanced readings of Crawford reject those readings that ‘focus too narrowly on the question of whether a document may be used in litigation. This was but one of the several considerations that Crawford identified as bearing on whether evidence is testimonial [and] [n]one of these factors was deemed dispositive.’ (People v. So Young Kim (2006), 368 Ill.App.3d 717 [720], 307 Ill.Dec. 92, 859 N.E.2d 92, 94 [certification of Breathalyzer machine used to determine blood-alcohol content not testimonial].)” Geier, 41 Cal.4th at 600, 61 Cal.Rptr.3d 580, 161 P.3d 104. See also People v. Johnson (2004), 121 Cal.App.4th 1409, 1412, 18 Cal.Rptr.3d 230 (“A laboratory report does not ‘bear testimony,’ or function as the equivalent of in-court testimony. If the preparer had appeared to testify * * * he or she would *382 merely have authenticated the document”); Commonwealth v. Verde (2005), 444 Mass. 279, 283-284, 827 N.E.2d 701 (certificates of chemical analysis “merely state the results of a well-recognized scientific test determining the composition and quantity of the substance” and have “very little kinship to the type of hearsay the confrontation clause was intended to exclude * * *. [I]t is akin to a business or official record, which the [Crawford ] Court stated was not testimonial in nature”).
{¶ 66} After reviewing the various cases from around the country (including our decision in State v. Craig), the California Supreme Court in Geier concluded, “While we have found no single analysis of the applicability of Crawford and Davis to the kind of scientific evidence at issue in this case to be entirely persuasive, we are nonetheless more persuaded by those cases concluding that such evidence is not testimonial, based on our own interpretation of Crawford and Davis.” Geier, 41 Cal.4th at 605, 61 Cal.Rptr.3d 580, 161 P.3d 104. The Geier court determined that the key factor for determining that a scientific-test report is “testimonial” is whether it “describes a past fact related to criminal activity” even when the report was made at the request of law-enforcement officers and was prepared for possible use at trial. Id.
{¶ 67} In answering this key question in the negative, the Geier court stated that the report of the DNA analyst who did the actual testing “constitute^] a contemporaneous recordation of observable events rather than the documentation of past events. That is, [the analyst] recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks. ‘Therefore, when [she] made these observations, [she] — like the declarant reporting an emergency in Davis — [was] “not acting as [a] witness[ ];” and [was] “not testifying.” ’ ” Id. 41 Cal.4th at 605-606, 61 Cal.Rptr.3d 580, 161 P.3d 104, quoting United States v. Ellis (C.A.7, 2006), 460 F.3d 920, 926-927.
(¶ 68} We agree with this analysis in Geier, which specifically rejects the approach of those courts that hold that laboratory reports are testimonial “because their primary purpose was to establish a fact at trial regarding the defendant’s guilt,” id., including State v. March (Mo.2007), 216 S.W.3d 663. March and decisions like it improperly read Davis to find any statement “testimonial” whenever it might reasonably be expected to be used at trial, when the inquiry actually should focus on “whether the statement represents the contemporaneous recordation of observable events.” Geier, 41 Cal.4th at 606 and 607, 61 Cal.Rptr.3d 580, 161 P.3d 104.
{¶ 69} In ultimately determining that the DNA report at issue in that case was nontestimonial, the Geier court observed that the report and notes of the DNA analyst who did the testing “were generated as part of a standardized scientific *383 protocol that she conducted pursuant to her employment at [the lab]. While the prosecutor undoubtedly hired [the lab] in the hope of obtaining evidence against defendant, [the testing analyst] conducted her analysis, and made her notes and report, as part of her job, not in order to incriminate defendant. Moreover, to the extent [the testing analyst’s] notes, forms and report merely recount the procedures she used to analyze the DNA samples, they are not themselves accusatory, as DNA analysis can lead to either incriminatory or exculpatory results. Finally, the accusatory opinions in this case * * * were reached and conveyed not through the nontestifying technician’s laboratory notes and report, but by the testifying witness.
{¶ 70} “ * * * In simply following [the lab’s] protocol of noting carefully each step of the DNA analysis, recording what she did with each sample received, [the testing analyst] did not ‘bear witness’ against defendant. (State v. Forte, supra, [360 N.C. at 435] 629 S.E.2d at p. 143.) Records of laboratory protocols followed and the resulting raw data acquired are not accusatory. ‘Instead, they are neutral, having the power to exonerate as well as convict.’ (Ibid.)” Geier, 41 Cal.4th at 607, 61 Cal.Rptr.3d 580, 161 P.3d 104.
Ill
{¶ 71} Based on the Geier court’s broad generalized conclusion that DNA and other scientific-testing reports are manifestly not testimonial, any factual distinctions between the situation in that case and the situation in the case sub judice are irrelevant for our purposes. Thus, it makes no difference that the DNA testing in Geier was done by a private laboratory in contrast to the fact that BCI did the testing in the present case. Furthermore, it makes no difference that the analyst who testified in Geier personally signed the DNA report, in contrast to the facts here that Wiechman did not sign either DNA report and specifically participated only in the “second round” of DNA testing that produced State’s Exhibit 57. Due to the nature of the Geier court’s fundamental reasoning, its conclusion that DNA reports are nontestimonial is fully applicable to the circumstances of this case as persuasive authority.
{¶ 72} The reasoning of Geier is also fully consistent with our reasoning and result in Craig. See 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621. The DNA reports at issue in this case are no different from the autopsy report at issue in Craig for Confrontation Clause purposes. Under Evid.R. 803(6), the reports are business records of scientific tests that are nontestimonial under Crawford and Davis. The reports fall well outside the “core class” of statements identified in Crawford that may implicate the Confrontation Clause. Furthermore, in this case, Wiechman was a qualified expert who was subject to cross-examination, as was the testifying doctor in Craig. When DNA reports are *384 properly determined to be nontestimonial, it necessarily follows that Crager’s Sixth Amendment Confrontation Clause rights were not violated.
{¶ 73} Although we acknowledge that the record shows that Wiechman played no role in developing the DNA analysis that resulted in State’s Exhibit 56 in this case, that concern is irrelevant. As in Geier and in Craig, the testifying witness, Wiechman, conveyed the “testimonial” aspects of the DNA results against Crager, and Wiechman was subject to cross-examination. Just as in Craig, the defense had the opportunity to question Wiechman “about the procedures that were performed, the test results, and [his] expert opinion about” the conclusions to be drawn from the DNA reports. Id., 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 79. Wiechman had fully reviewed the complete file, not just the DNA reports admitted into evidence and not just the report he participated in preparing, and had reached his own conclusions about both reports “to a reasonable degree of scientific certainty.” It is thus of no import that he did not actively participate in both rounds of DNA testing.
{¶ 74} An examination of defense counsel’s cross-examination of Wiechman reveals that this case does not implicate the types of abuses that concerned the Crawford court. Crager did not challenge the specific testing protocol or the accuracy of the raw data. There is no indication in the questions or in Wiechman’s responses that there were any flaws in the testing itself. Rather, defense counsel principally questioned Wiechman about general matters known to any DNA expert, such as the limits of what DNA testing can establish. When defense counsel did question the specifics of the DNA test results in this case, Wiechman was fully qualified to, and did, answer any questions defense counsel asked.
{¶ 75} Furthermore, for the most part, Wiechman responded with answers that helped the defense make its points, such as that DNA testing cannot establish how a particular stain came to be on a particular item or when a person’s DNA might have appeared on an item. In addition, defense counsel was able to establish through Wiechman’s testimony that some items that could have been tested were not. As with the autopsy in Craig, Wiechman readily asserted that he himself had not done the actual DNA testing, so the jury was well aware of that fact.
{¶ 76} It is apparent that Crager’s right to confrontation was not at all affected by Wiechman’s testifying. Moreover, if Duvall, who actually did the DNA testing, had testified instead of Wiechman, her responses to defense counsel’s questions likely would have been very similar, if not identical, to Wiechman’s. There are no indications that Crager was not able to conduct a meaningful cross-examination concerning State’s Exhibit 56.
*385 {¶ 77} As a final matter, the practical results of affirming the judgment of the court of appeals in this case would be problematical. If all the DNA analysts who had actively participated in the testing and review process that generated the DNA reports were unavailable to testify (for example, if all had died), should that mean that no expert DNA witness, after reviewing the relevant materials, would have been qualified to testify? If that were the situation, would the DNA tests have to be redone, even though there are no questions about the accuracy of the tests, and there are no indications of any discrepancies? These potential consequences seem especially incongruous when viewed in light of the considerations discussed above, i.e., that records of laboratory protocols that were followed and of the resulting raw data are not accusatory and therefore are not “testimonial.”
{¶ 78} For all the foregoing reasons, we hold that records of scientific tests are not “testimonial” under Crawford. This conclusion applies to include those situations in which the tests are conducted by a government agency at the request of the state for the specific purpose of potentially being used as evidence in the criminal prosecution of a particular person.
{¶ 79} We further hold that a criminal defendant’s constitutional right to confrontation is not violated when a qualified expert DNA analyst testifies at trial in place of the DNA analyst who actually conducted the testing. In that situation, the testifying expert analyst is the witness who is subject to cross-examination and is the one who presents the true “testimonial” statements.
{¶ 80} Accordingly, we reverse the judgment of the court of appeals. We remand the cause to that court to address the unresolved assignments of error that it found moot and therefore did not address.
Judgment reversed and cause remanded.
Lundberg Stratton, O’Donnell, and Lanzinger, JJ., concur.
Kline, J., concurs separately.
Moyer, C.J., and Pfeifer, J., dissent.
Roger L. Kline, J., of the Fourth Appellate District, sitting for Cupp, J.

. After the trial court’s ruling, but prior to Wiechman’s testimony, the state offered the testimony of BCI analyst Mark Losko, a forensic scientist in the DNA/Serology section of BCI, who did the serology work in this case. Losko testified that analysts in the serology section “examine the evidence and try to identify the stain of interest, whether it be blood, semen, or saliva. We obtain those samples for DNA testing.” Losko discussed some of the items upon which DNA testing was conducted by Duvall and explained how he obtained the samples from the items for testing. Losko’s serology reports were admitted into evidence as State’s Exhibits 54 and 55.

. Our recent decision in State v. Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, involved statements made by a witness to a police officer during interrogation, and therefore is distinguishable from the instant case.