DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from a judgment of the Lucas County Court of Common Pleas, which, after a jury trial, found defendant-appellant, Walter D. Triplett, guilty of aggravated murder and aggravated robbery. For the reasons that follow, we affirm the trial court's judgment. *Page 2 
 {¶ 2} On June 24, 2003, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01(B), and one count of aggravated robbery, in violation of R.C. 2911.01(A)(3). The charges stemmed from the November 20, 1998 homicide of Paul Wiggins. On June 26, 2003, appellant entered not guilty pleas to the charges.
 {¶ 3} The case proceeded to trial on April 4, 2005, and the following relevant evidence was presented. Toledo Police Patrol Officer Richard Carl testified that on November 22, 1998, he was dispatched to 3327 North Detroit Avenue, Apartment 4; when he arrived, Officer Carl observed a black male under a table lying in a pool of blood. The male was pronounced dead by the fire department. Officer Carl testified that he had no idea how long the body had been there.
 {¶ 4} Toledo Police Patrol Officer Theresa Sanders testified that on November 25, 1998, appellant called the police department to turn himself in; Officer Sanders arrested appellant and took him to the detective bureau. Sanders testified that appellant was very cooperative.
 {¶ 5} Toledo Police Detective James Trout testified that in 1998, he was assigned to the crimes against persons unit and that he investigated the homicide at 3327 North Detroit Avenue. When Detective Trout arrived at the address, the scene was being secured and processed. Trout testified that they were able to identify the victim as Paul Wiggins. Detective Trout also identified photographs of the crime scene; a videotape of the crime scene was also played. *Page 3 
 {¶ 6} Detective Trout testified that on November 25, 1998, he interviewed appellant. According to Detective Trout, appellant acknowledged that 3327 North Detroit Avenue, Apartment 4, was his apartment and that he allowed the victim to "conduct business" out of the apartment. Detective Trout clarified that the victim would give appellant drugs and/or money in exchange for appellant allowing him to deal drugs out of the apartment.
 {¶ 7} Detective Trout stated that appellant told him that he had arrived at the dark apartment, stopped in the bathroom and then decided to go into the kitchen where he discovered Wiggins' body. Appellant was afraid and left the apartment. Detective Trout testified that he questioned appellant about an injury to his left wrist; appellant pulled out a watch that was broken.
 {¶ 8} Toledo Police Detective Steve Forrester testified that he is a supervisor of the cold case unit and that they reviewed the Wiggins homicide. Detective Forrester testified that they retrieved appellant's shoes from the property room and observed what appeared to be blood; they repackaged the shoes and sent them to the Bureau of Criminal Investigations ("BCI").
 {¶ 9} Toledo Police Detective James Scott testified that he is assigned to the cold case homicide squad. On June 24, 2003, Detective Scott interviewed appellant who stated that on the night he found Wiggins' body he touched it to check for a pulse. Appellant further stated that he originally intended to get rid of the body with a quilt that was lying in the hallway. *Page 4 
 {¶ 10} According to Detective Scott, appellant stated that on Friday, November 20, 1998, he was with Carol Spidell and some other friends and that they had been getting high throughout the night. The group went to a few locations and continued to use drugs. Appellant stated that he could not remember when he returned to his apartment but he knew that it was Saturday night.
 {¶ 11} Toledo Police Detective Keefe Snyder testified that he is in charge of the scientific investigation unit. Detective Snyder testified that Detective Trout requested that he collect clothing and shoes from appellant. Detective Snyder testified that on November 27, 1998, he packaged the shoes taken from appellant on November 25, and personally delivered them to the police crime lab. Snyder testified that although he observed what he believed to be blood on both shoes, the shoes were not sent to the BCI until 2003. Detective Snyder testified that it was the investigating detective's decision regarding whether DNA testing would be conducted.
 {¶ 12} The state presented the testimony of three women who knew appellant and had knowledge of the alleged homicide. Carol Spidell testified that in November 1998, she was appellant's former fiancée. Spidell testified that she lived with appellant at 3327 North Detroit Avenue, Apartment 4, for about six months. Spidell stated that during the time she lived with appellant he did not work; he received an SSI check and would go out and "hustle."
 {¶ 13} Spidell testified that around November 20, 1998, appellant asked to borrow her car. Spidell indicated that she had to take a man named Frank Belle home. At Belle's *Page 5 
house, appellant again indicated that he wanted to borrow her car, and he stated that he wanted to get his clothes. According to Spidell, appellant requested the ignition and the trunk key; appellant became angry when Spidell would not give him the trunk key.
 {¶ 14} Prior to leaving with Spidell's car, appellant told Spidell and Belle that he had won the lottery; Spidell testified that appellant had more money than usual. Spidell also stated that appellant had been using marijuana, crack, and some drug he injected into his arm. Further, appellant had been with a man nicknamed "Junkman" with whom he would sell stolen goods. Spidell stated that when appellant was using drugs he became violent.
 {¶ 15} Spidell testified that when appellant took her car she told him to return it the same night, he did not. On Sunday morning Spidell began looking for appellant because she needed the car to take her mother to church. According to Spidell, appellant's sister saw the car parked behind 3327 North Detroit Avenue. Spidell went to appellant's apartment, knocked on the door, and walked in. Spidell testified that she walked to the back of the apartment and saw the victim lying on the floor.
 {¶ 16} Spidell admitted that in 1998, she smoked marijuana and crack and drank alcohol. Spidell also admitted that she had prior drug convictions and a theft conviction.
 {¶ 17} During cross-examination, Spidell testified that on November 20, 1998, she used marijuana and crack. Appellant and Junkman came over to "Mr. Tim's house" to buy drugs; they were going to go sell stolen coats. Spidell agreed that appellant made money from "hustling." Spidell testified that she saw appellant on November 20, 21, and *Page 6 
22, and that at no time did it appear that he had been in a fight. Spidell further testified that nothing in her car had been altered.
 {¶ 18} Cheryl Coleman testified that in November 1998, she lived with her boyfriend in an apartment complex on Hill Avenue. Coleman testified that she has known appellant for 42 years; she had used drugs and has seen appellant use drugs. Coleman testified that she had been incarcerated for grand theft and, subsequently, a parole violation.
 {¶ 19} Coleman testified that late on November 25, 1998, appellant and Niece Overton knocked on her door; Coleman stated that Overton was very petite "like a [size] three or a five." Coleman testified that appellant appeared "spazzed" or "frantic." According to Coleman, appellant stated that he "fucked up really, really bad" and that he "beat a dude down," "beat him down real bad." Appellant stated that he "beat him down under the table." Coleman asked appellant whom he had beaten and appellant stated "my little nigger." Coleman testified that she asked appellant why and he stated it was over "some damn dope."
 {¶ 20} Coleman testified that appellant offered her money and drugs in exchange for allowing him to stay at her apartment for a few days. Coleman refused and appellant and Overton left.
 {¶ 21} Coleman testified that shortly after appellant left she decided to leave the apartment and go to the store; Coleman stated that she saw appellant and Overton leaving in a white, older model Cadillac. Coleman followed them, and when she got near the *Page 7 
Scott Park Toledo Police District Station, she turned in and reported that appellant had hurt someone. During cross-examination, Coleman admitted that she had used aliases as a way to stay out of trouble. Coleman also admitted that she did not actually see appellant and Overton exit or enter the Cadillac.
 {¶ 22} Chandra Fetherman testified that she met appellant in 1999, she "worked" for him as a prostitute. Regarding the events of November 1998, Fetherman testified that appellant told her that he had been fighting with Spidell and that she would not give him any money. Appellant left and went over to the apartment on North Detroit; the apartment was in his name because the victim could not get it in his name. According to Fetherman, appellant stated that he and the victim were in business together and that appellant went to the apartment to see if he could get some money. Appellant and the victim argued about money. Fetherman testified that appellant went outside, retrieved a blunt object from his vehicle, approached the victim from behind and "literally beat the hell out of him." Fetherman further testified that appellant stated that he took money from the victim.
 {¶ 23} During cross-examination, Fetherman was questioned about inconsistencies between her in-court testimony and her 2003 statement to police. She admitted that she did not tell the police that appellant approached the victim from behind. Fetherman stated that from 1999 until 2003, she was a regular crack user. Fetherman admitted that she had used several aliases and a few different social security numbers to avoid trouble. *Page 8 
 {¶ 24} Lucas County Deputy Coroner Diane Scala-Barnett testified that she performed an autopsy on the victim; she reviewed the victim's external and internal injuries referring to photographs which were admitted into evidence. Dr. Scala-Barnett also testified regarding the blood spatter on the wall and baseboard near where the victim was found. Scala-Barnett testified that most of it was low on the wall; Scala-Barnett concluded that most of the beating occurred while the victim was under the table. Dr. Scala-Barnett also surmised, based on the blood spatter on the victim's shirt and the injuries to his head, that the victim was beaten with a cylindrical object. Dr. Scala-Barnett testified that the cause of the victim's death was multiple blunt force injuries.
 {¶ 25} During cross-examination, Dr. Scala-Barnett admitted that she could not tell whether more than one pipe was used or whether more than one individual inflicted the injuries. Dr. Scala-Barnett was also questioned as to why only four blood spatter spots were found on appellant's shoes, that there should have been more; she had no opinion.
 {¶ 26} Two witnesses from the BCI office located in Bowling Green, Ohio, testified regarding the testing of the blood found on appellant's shoes. Stacy Violi testified that she is a forensic scientist and works in the DNA serology section. Violi testified that on March 5 and 6, 2003, she examined appellant's clothing and shoes and a watch and pipe. Violi stated that she found no blood on the clothing, pipe, or watch. Violi testified that she found that the left shoe presumptively indicated the presence of blood. *Page 9 
 {¶ 27} Julie Cox testified that she is also a forensic scientist and is assigned to the DNA unit. Cox testified that she did not perform the DNA testing on the shoe samples. Cox stated that Cassandra Agosti performed the testing but that she is no longer with the BCI. Cox testified that she is familiar with the report, because she performed the technical review which is done by a qualified peer. Appellant's counsel objected to Cox testifying as to the DNA results because she merely reviewed the test. Since she did not perform an independent evaluation, counsel claimed that the evidence was inadmissible hearsay. The court overruled the objection and Cox testified that the major DNA profile taken from the shoe sample was consistent with the victim's.
 {¶ 28} Appellant presented the testimony of Deniece Overton. Overton testified that she has known appellant for many years. Overton also testified that Cheryl Coleman is her mother's friend. Overton testified that in November 1998, she saw appellant but she never drove him to Coleman's apartment. Overton did testify that she had a white Cadillac. Overton stated that she became aware that appellant was charged with murder when detectives knocked on her door and requested to speak with her. Overton accompanied the officers to the main police station; they asked her if they could process her vehicle for appellant's fingerprints and/or fibers from his clothing. Overton testified that the police processed her vehicle, found nothing, and returned it to her.
 {¶ 29} When questioned, Overton admitted that her vehicle had been previously stopped and searched for a "murder weapon;" the police found nothing and allowed her to *Page 10 
leave. Overton further testified that Toledo Police Detective Scott interviewed her in January or February 2005; she fully cooperated with him.
 {¶ 30} During cross-examination, Overton testified that appellant is a lifelong friend of hers. Overton testified that in 1998, she owned two Cadillacs and that one was white; Overton stated that the police only questioned her about the white Cadillac. Overton testified that she wore a size three in 1998, but that she has always been small. Overton testified that she was convicted of petty theft in 1999.
 {¶ 31} David Barnes testified that he is an adjunct instructor at Terra State Community College; he retired from the BCI after 29 years. At the BCI, Barnes was a crime scene agent and would assist law enforcement in the documentation and collection of physical evidence. Barnes testified that he had investigated 444 homicide or suspected homicide scenes. Barnes testified that he has routinely seen blood stains at crime scenes and has received extensive training in the interpretation of blood stains.
 {¶ 32} Barnes testified that he was contacted by Toledo Police Detective Steve Forrester to examine photographs of the crime scene and photographs and a sketch of appellant's left tennis shoe. Barnes testified that based on his education, training, and experience, he would have expected more blood on the shoe.
 {¶ 33} At the conclusion of the testimony, the jurors began their deliberations. Thereafter, the jury found appellant guilty of aggravated murder and aggravated robbery.
 {¶ 34} At the April 19, 2005 sentencing hearing, appellant was sentenced to life imprisonment without the possibility of parole for 20 years on the aggravated murder *Page 11 
offense, and ten years of imprisonment on the aggravated robbery offense to be served consecutively to the aggravated murder sentence. An April 21, 2005 sentencing judgment entry followed.
 {¶ 35} Appellant now appeals the judgment against him, setting forth the following five assignments of error:
 {¶ 36} "ASSIGNMENT OF ERROR NUMBER ONE
 {¶ 37} "The trial court erred to the prejudice of Mr. Triplett by permitting the introduction of the analysis of DNA results without requiring the examiner's testimony in violation of his right to confront witnesses and his right to due process in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution, or, in the alternative, trial counsel was ineffective in failing to raise the issue of confrontation under the United States and Ohio Constitutions.
 {¶ 38} "ASSIGNMENT OF ERROR NUMBER TWO
 {¶ 39} "Prosecutorial misconduct during the trial deprived Mr. Triplett of a fair and reliable trial in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution. *Page 12 
 {¶ 40} "ASSIGNMENT OF ERROR NUMBER THREE
 {¶ 41} "The trial court erred in denying Mr. Triplett's motion to dismiss pursuant to Rule 29 presented at the conclusion of the State's case in chief for the reason that the evidence presented was insufficient to sustain convictions as to each count.
 {¶ 42} "ASSIGNMENT OF ERROR NUMBER FOUR
 {¶ 43} "The trial court's sentence as to count two (aggravated robbery) must be remanded to the trial court for resentencing in light of State v. Foster, or, in the alternative, trial counsel was ineffective in not raising the Foster issue.
 {¶ 44} "ASSIGNMENT OF ERROR NUMBER FIVE
 {¶ 45} "Cumulative errors deprive a criminal defendant and criminal appellant of a fair trial in violation of his rights under the Fifth,Sixth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution."
 {¶ 46} In his first assignment of error, appellant contends that the DNA test results from the blood on appellant's shoe were not admissible pursuant to Crawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 1354,158 L.Ed.2d 177, without the testimony of the BCI scientist who conducted the testing. Appellee asserts that the test results were admissible under Evid.R. 803(6) as a business record. Alternatively, appellee argues that appellant was not prejudiced by the admission of the DNA test results given the other evidence placing appellant at the murder scene. *Page 13 
 {¶ 47} In State v. Crager, ___Ohio St.3d___, 2007-Ohio-6840, the Supreme Court of Ohio addressed a nearly identical issue. InCrager, testimony of DNA test results was given by a BCI analyst who did not actually perform the testing; the individual who conducted the testing was on a maternity leave. The analyst testified that he conducted a "technical review" of the tester's report. Id., ¶ 17.
 {¶ 48} The court held that "records of scientific tests are not testimonial under Crawford" and that "[a] criminal defendant's constitutional right to confrontation is not violated when a qualified expert DNA analyst testifies at trial in place of the DNA analyst who actually conducted the testing." Id., paragraphs one and two of the syllabus. In accordance with Crager, we find that appellant's right to confrontation of witnesses was not violated by the testimony of BCI analyst, Julie Cox. Appellant's first assignment of error is not well-taken.
 {¶ 49} Appellant's second assignment of error claims that prosecutorial misconduct denied him a fair trial. Specifically, appellant claims prejudice based on the conduct of the prosecutor during voir dire, opening statements, the trial itself, and closing arguments.
 {¶ 50} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. State v. Newton, 108 Ohio St.3d 13,2006-Ohio-81, ¶ 92 citing State v. Smith (1984), 14 Ohio St.3d 13, 14. *Page 14 
 {¶ 51} Appellant first claims that he was prejudiced during voir dire by the prosecutor's characterization of defense counsel as "charming" and commenting on his ability to learn the potential juror's names. Appellant contends that such comments, which were objected to, were an attempt to impugn the integrity of the defense. Upon review, we find that while the comments may have been improper, they did not prejudicially affect appellant's right to a fair trial.
 {¶ 52} Appellant next argues that during opening statements, the prosecutor's comment that the victim "can't be with us in body today but in spirit" was prejudicial. Counsel objected to the comment; the trial court sustained the objection. We agree that the comment was improper but appellant has failed to demonstrate any resultant prejudice.
 {¶ 53} During the examination of Cheryl Coleman, the prosecutor asked Coleman if she had ever seen appellant with a pipe; no testimony had been presented to suggest that appellant had a pipe or any other weapon. Defense counsel objected to the question and asked that the prosecutor be admonished and the jury be given an instruction. The trial court sustained the objection but did not admonish the prosecutor or instruct the jury. The question was rephrased as: "Have you ever seen Mr. Triplett with a weapon?" Coleman answered negatively. Accordingly, we find no prejudice.
 {¶ 54} Finally, appellant argues that the prosecutor made various inappropriate comments during closing arguments. Foremost, appellant contends that the prosecutor improperly commented on appellant's failure to testify at trial. It is well-settled that a *Page 15 
prosecutor's comments upon the accused's failure to testify are prejudicial and violate the Self-Incrimination Clause of the Fifth andFourteenth Amendments to the United States Constitution. Griffen v.California (1965), 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106.
 {¶ 55} Further, we note that it is significant if the jury is given the proper instruction by the court not to consider the accused's failure to testify for any purpose. State v. Ferguson (1983),5 Ohio St.3d 160, 163. A jury is presumed to follow the instructions of the trial court, id., and such instructions can aid to negate any potential prejudice arising from improprieties in the prosecutor's argument.State v. Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 95.
 {¶ 56} In the present case, the comment in dispute is as follows:
 {¶ 57} "[Prosecutor] Of course, some of the statements that Mr. Triplett would make are what you would expect, because it's normal and consistent for people to make self-serving statements. And Mr. Triplett, better than anybody in this courtroom, knows the time and the date that he has to have an alibi for. Because the State submits to you, ladies and gentlemen, he's the only one in here that can tell us the time that the beating occurred."
 {¶ 58} Defense counsel objected to the statement; the objection was sustained. Later, the court instructed the jury regarding appellant's right not to testify and that his failure to testify must not be considered.
 {¶ 59} Upon review of the comment in context of the state's argument, it appears that the prosecutor was responding to statements made by appellant to police and his *Page 16 
comment to Carol Spidell that he won the lottery. We agree that the statement could easily be construed as a comment on appellant's failure to testify; however, any prejudice was remedied by the court's instruction to the jury.
 {¶ 60} In addition to the above statement, appellant also argues that during closing arguments the prosecutor improperly commented on facts that were not in evidence. Specifically, defense counsel objected to the statements that the victim's shoe was in blood and that his other shoe had been removed. The objections were sustained. Upon review, we cannot find that these comments prejudicially affected appellant's right to a fair trial.
 {¶ 61} Based on the foregoing, although we believe that some of the prosecutor's comments were improper, the comments did not prejudicially affect the outcome of appellant's trial. Appellant's second assignment of error is not well-taken.
 {¶ 62} In appellant's third assignment of error he contends that the trial court erroneously denied his Crim.R. 29 motion for acquittal because the evidence was insufficient to sustain convictions on the aggravated murder and aggravated robbery charges. Crim.R. 29(A) provides that the trial court shall enter a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus, "the test an appellate court must apply when reviewing a challenge based on a denial of a motion for acquittal is the same as in reviewing a challenge based upon on the sufficiency of the evidence to support a conviction." State v. Thompson (1998), 127 Ohio App.3d 511,525. *Page 17 
 {¶ 63} The crux of appellant's argument is that absent the DNA evidence (which State v. Crager, infra, found to be admissible), the state's case was supported solely by drug users with "significant" criminal histories. This is a credibility argument. It is well-known that it is within the province of the jury to determine the credibility of the witnesses. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The state and defense counsel questioned the witnesses regarding their drug use and criminal histories. Based on the testimony presented and viewed in a light most favorable to the prosecution, we find that sufficient evidence existed to show that appellant purposely caused the death of another while committing or attempting to commit aggravated robbery. Appellant's third assignment of error is not well-taken.
 {¶ 64} In his fourth assignment of error, appellant contends that his non-minimum, consecutive sentence as to the aggravated robbery offense should be remanded for resentencing under State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856. Appellee concedes this point with reference to the sentencing judgment entry only. In Foster, the Supreme Court of Ohio found that various provisions of the Ohio sentencing statutes were unconstitutional because they required judicial factfinding in violation of a defendant's Sixth Amendment rights. The court severed those provisions including R.C. 2929.14(B) and (E)(4), which addressed non-minimum and consecutive sentences, and R.C. 2929.19(B)(2), which required certain findings by the trial court at the sentencing hearing. *Page 18 
 {¶ 65} Subsequently, clarifying Foster, the Supreme Court of Ohio addressed the issue of whether, where a defendant is sentenced after the date of the decision in Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2531, 159 L.Ed.2d 403, a defendant forfeits the Blakely argument by failing to object at sentencing. State v. Payne, 114 Ohio St.3d 502,2007-Ohio-4642. The court determined that such argument is forfeited and that the claim could only be addressed under the "plain error" standard. Id., ¶ 13.
 {¶ 66} In the present case, appellant was sentenced in April 2005, after Blakely was decided. Since appellant did not object at the time of sentencing, we must review appellant's fourth assignment of error under the "plain error" standard.
 {¶ 67} To prevail on a claim governed by the plain error standard, appellant must demonstrate that the trial outcome would have been clearly different but for the alleged errors. State v. Waddell (1996),75 Ohio St.3d 163, 166. Regarding Blakely claims, unless a defendant shows that the court would have imposed a different or more lenient sentence absent the Blakely error, no plain error occurred.Payne, supra, ¶ 25.
 {¶ 68} In this case, appellant was sentenced within the parameters of the statutory limits for each offense. Furthermore, even presuming aBlakely error existed, after review of the sentencing hearing we cannot say that the trial court would have imposed a more lenient sentence. Therefore, we find that no plain error occurred and appellant'sFoster/Blakely claim must fail.
 {¶ 69} Alternatively, appellant contends that trial counsel was ineffective by failing to raise the Foster/Blakely issue at sentencing. To prove ineffective assistance of *Page 19 
counsel an appellant must show: (1) that the trial attorney made errors so egregious that the trial attorney was not functioning as the "counsel" guaranteed appellant under the Sixth Amendment, and (2) that the deficient performance prejudiced appellant's defense. Strickland v.Washington (1984), 466 U.S. 668, 686-687, 104 S.Ct. 2052,80 L.Ed.2d 674. In essence, appellant must show that the proceedings, due to his attorney's ineffectiveness, was so demonstrably unfair that there is a reasonable probability that the result would have been different absent his attorney's deficient performance. Id. at 693. Thus, an ineffective assistance of counsel claim requires a lesser showing, a reasonable probability of a different result, than the plain error standard. Nevertheless, we believe that appellant's ineffective assistance of counsel claim must also fail due to lack of a reasonable probability that he would have received a more lenient sentence had counsel raised aFoster/Blakely objection. Appellant's fourth assignment of error is not well-taken.
 {¶ 70} In appellant's fifth and final assignment of error he contends that the cumulative effect of errors deprived appellant of a fair trial. We have stated, "although a particular error by itself may not constitute prejudicial error, the cumulative effect of the errors may deprive a defendant of a fair trial and may warrant the reversal of his conviction." State v. Hemsley, 6th Dist. No. WM-02-010, 2003-Ohio-5192, ¶ 32, citing State v. DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. "`However, in order even to consider whether `cumulative' error is present, we would first have to *Page 20 
find that multiple errors were committed in this case.'"Hemsley, ¶ 32 quoting State v. Madrigal (2000), 87 Ohio St.3d 378, 398,2000-Ohio-448.
 {¶ 71} Upon review of appellant's preceding four assignments of error, we cannot say that there were multiple instances of harmless error; accordingly, there can be no cumulative error. Appellant's fifth assignment of error is not well-taken.
 {¶ 72} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
 Handwork, J., Pietrykowski, P.J. and Skow, J., concur. *Page 1