[Cite as *In re B.N.C.*, 2013-Ohio-4071.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

IN RE: B.N.C.

Appellate Case No.     25615

Trial Court Case No.   JC 2011-7588

(Appeal from Common Pleas Court-
 Juvenile Division)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 20th day of September, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ANDREA M. SEIELSTAD, Atty. Reg. No. 0066227, University of Dayton School of Law, 300 College Park, Dayton, Ohio 45469
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Appellant, B.C., appeals from a judgment of the Montgomery County Court of

Common Pleas, Juvenile Division, which adjudicated B.C. to be a delinquent child, due to B.C.

having knowingly offered to sell a controlled substance, Vicodin, in violation of R.C. 2925.03(A)(1), (C)(2)(a), an act that would have been a felony of the fifth degree if committed by an adult.[1]  The trial court ordered B.C. to be committed to the Department of Youth Services (DYS) for a minimum period of six months and a maximum period of age 21.  However, the trial court suspended the commitment on condition of good behavior.  The court also imposed 13 days of correction time in the local juvenile facility, with 10 days suspended, a probationary period of six months, and other minor sanctions.

{¶ 2}    B.C. contends that his adjudication as a delinquent is not supported by sufficient evidence and is contrary to law.  He also maintains that R.C. 2925.51, as written and applied, deprives him of his Right of Confrontation under the Sixth Amendment to the U.S. Constitution.  In addition, B.C. contends that he submitted a proper written demand in accordance with R.C. 2925.51 and did not waive his right to demand testimony from a lab analyst.

{¶ 3}    B.C. additionally challenges the trial court's denial of his motion to suppress evidence.  Finally, B.C. argues that the trial court erred in ordering him to serve correction time without reconsidering his disposition.

{¶ 4}    We conclude that B.C.'s adjudication as a delinquent is supported by sufficient evidence.  We further conclude that R.C. 2925.51, as written and applied, did not deprive B.C. of his Right of Confrontation under the Sixth Amendment to the U.S. Constitution.  As an additional matter, B.C. waived the right to demand testimony, based on his failure to submit a written demand in accordance with R.C. 2925.51.  B.C. also waived issues pertaining to the search and seizure, other than plain error, by failing to file a motion to suppress, and by failing to

---

[1]    The parties have referred to Appellant as B.C., even though his case is captioned *In re B.N.C.*   For purposes of simplicity and convenience, we will refer to Appellant as "B.C."

set forth good cause for raising the issue in an untimely fashion. Even if the suppression issue had been properly raised, it is without merit, because the detectives had probable cause to arrest B.C., and the search was lawful as incident to the arrest. Finally, the trial court did not err in failing to reconsider B.C.'s disposition after ruling on the objections to the magistrate's report. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 5} At some time prior to September 12, 2011, Dayton Police Detective, Ryan Halburnt, received a drug complaint regarding an address on Coventry Rd., which is located in Dayton, Ohio. The target of the investigation was an individual named Jordan Pierce. As a result of the complaint, Halburnt conducted surveillance on Pierce's residence on several occasions. During the surveillance, Halburnt had seen Pierce come out of his house and go to cars that had been parked outside for less than a minute. Pierce would reach into the passenger window of the car, conduct what appeared to be a drug transaction, and go back into the house.

{¶ 6} At about 6:30 p.m. on September 12, 2011, Halburnt and another detective, Gregory Orick, were watching Pierce's house. They were wearing plain clothes and were in an unmarked vehicle. The detectives saw Pierce leave the house and go to the corner of Coventry Rd. and Cleveland Ave., which was a few houses down from where Pierce lived. There, Pierce made contact with B.C., and B.C.'s brother, J.C. At that point, Orick and Halburnt began to follow the suspects. Orick was driving, and Halburnt was sitting in the passenger seat, with binoculars.

{¶ 7} The detectives saw the three suspects walk slowly up Cleveland Avenue. The suspects would stop for a few seconds and then continue walking. At some point, Halburnt saw

both B.C. and J.C. hand Pierce money. Pierce then handed something to both of them. Halburnt was unable to tell what Pierce handed B.C. and J.C., but Pierce made hand-to-hand contact with them both.

{¶ 8} After the hand-to-hand transactions occurred, the three suspects continued to walk up Cleveland Ave. They made a right turn onto John Glenn Rd., and walked down that road. At the next cross-street, which was Marimont Drive, Pierce turned right, on a path that would lead him back toward his house. B.C. and J.C. turned left onto Marimont Drive, and the detectives decided to follow them, because they had already identified Pierce, but had not yet identified B.C. and J.C. Almost immediately, B.C. and J.C. met up with a third person, T.F., who was on a bicycle.

{¶ 9} After seeing T.F., the detectives drove down Marimont Drive and onto Pershing Blvd., where they stopped on the side of the road. Halburnt was able to watch all three individuals as Orick was driving. T.F. was in the middle of the street, riding his bicycle. B.C. was in the right-hand lane of travel, walking toward the detectives, and J.C. was on the sidewalk. Halburnt did not lose sight of T.F. at any time. Eventually, Halburnt saw B.C. and T.F. interact. He could see them talking. T.F. got off his bicycle and handed B.C. money. Halburnt saw T.F. with his hand "cupped up" after he handed the money to B.C., and saw B.C. hand something to T.F. Neither Halburnt nor Orick could see exactly what was handed over.

{¶ 10} After the hand-to-hand transaction, Halburnt saw B.C. get onto T.F.'s bicycle and start to ride toward the detectives. T.F. was walking diagonally, continuing toward the detectives and also toward the sidewalk. At that point, the detectives decided to arrest the three individuals, who were about 15 yards away and were starting to separate. Halburnt made contact with T.F. and J.C., while Orick confronted B.C. Orick identified himself as a police

officer, and ordered B.C. to stop. B.C. did not initially comply, but eventually stopped. Orick then placed B.C. in custody. B.C. was still on the bicycle and would not get off, so Orick took B.C. off the bike and placed him in handcuffs.

{¶ 11}   After placing B.C. in handcuffs, Orick read B.C. his *Miranda* rights and obtained his acknowledgment of the rights. Immediately after the rights were administered, B.C. said, "This isn't any drug deal." Transcript of Proceedings, Volume II (December 5, 2011), p. 40.

{¶ 12}   When placing B.C. under arrest, Orick did a pat-down and discovered $45 in B.C.'s pocket. He did not find drugs. However, while patting T.F. down, Halburnt found two oval white pills that he believed were Vicodin or Hydrocodone, based on his experience. Later lab analysis indicated the pills were, in fact, Hydrocodone, a Schedule III drug. Pills were also found in J.C.'s possession.

{¶ 13}   After placing B.C., J.C., and T.F. under arrest, the detectives returned to Pierce's house to continue surveillance. As they pulled up to the house, Pierce was standing in the yard with several individuals. At that point, Halburnt and Orick had on badges and vests that identified them as Dayton police officers. When the detectives got out of their car and announced that they were police detectives, Pierce immediately attempted to run into his house. The detectives chased Pierce into the house and eventually arrested him after a short struggle. They found 18 Hydrocodone pills in Pierce's pocket that matched the pills they had taken from T.F. and J.C.

{¶ 14}   Subsequently, the State filed a complaint in Montgomery County Common Pleas Court, Juvenile Division, alleging that B.C., age 17, was delinquent due to having knowingly offered to sell a Schedule III controlled substance, Vicodin, in violation of R.C.

2925.03(A)(1), (C)(2)(a), which would be a fifth degree felony if committed by an adult. The matter was set for an adjudicatory hearing on November 4, 2011. However, the State indicated at the hearing that it had erroneously provided B.C. with a copy of a lab report pertaining to the drugs obtained from J.C., rather than T.F. In addition, the State noted that the defense had previously refused to stipulate to the lab report, and that the State would be uncomfortable giving the defense such short notice of the correct report.

{¶ 15} As a result of the error, the trial court continued the case. The State further noted that the defense had asked for all drug records in the case, and that the State would provide them.

{¶ 16} The adjudicatory hearing was reset for December 5, 2011, and was held on that date before a magistrate. In the meantime, the State filed an amended complaint including two additional charges – Possession of a Controlled Substance and Obstruction of a Public Official in Performance of His Duties. The State had also provided defense counsel with a copy of the correct lab report at the time of the November 4, 2011 hearing.

{¶ 17} At the beginning of the adjudicatory hearing, the trial court asked the parties if any issues remained regarding lab report discovery. The State indicated that there were no issues, and counsel for B.C. did not disagree. He also did not mention any issues.

{¶ 18} The State initially presented testimony from Detective Orick. During Orick's testimony, the State moved to admit State Exhibit A, which was a lab report dealing with the drugs obtained from T.F. The State's motion was made pursuant to R.C. 2925.51, which provides for self-authentication of reports and is prima facie evidence as to the content of the drugs. At that time, the defense objected, because no one was present to testify. The magistrate asked defense counsel if he had filed the necessary paperwork to object to the report, and defense

counsel said "no." Transcript of Proceedings, Volume II (December 5, 2011), p. 45.

{¶ 19} At the end of the State's case, the defense objected to the admission of the lab report on Confrontation Clause grounds, and also based on the fact that the defense had previously refused to stipulate to the report. The magistrate admitted the evidence over objection. After the defense concluded its case without presenting evidence, the magistrate dismissed the possession and obstruction counts, due to issues about proper notice having been afforded to the defense. However, the magistrate found B.C. responsible for trafficking and adjudicated him delinquent. Various conditions were imposed, including the suspended sentence to DYS and the 13-day local corrections period, with 10 days suspended.

{¶ 20} B.C. filed objections to the magistrate's decision in December 2011, and then filed supplemental objections in March 2012. In January 2013, the trial court overruled the objections and adopted the decision of the magistrate, including the sanctions that had been previously imposed. B.C. appeals from the judgment overruling his objections and adopting the magistrate's decision.

II. Is the Adjudication of Delinquency Based on Insufficient Evidence?

{¶ 21} B.C.'s First Assignment of Error states as follows:

B.C.'s Conviction of Drug Trafficking Is Against the Sufficiency of Evidence and Contrary to Law.

{¶ 22} Under the First Assignment of Error, B.C. contends that his adjudication of delinquency is not supported by sufficient evidence because the State failed to present enough evidence to establish the element of "sale" or an offer of sale. This argument is based on the fact that neither officer saw what was being exchanged, nor did they see B.C. in possession of

any illegal narcotic.  According to B.C., the State's case depends on a set of inferences upon inferences, which the law forbids.

{¶ 23}   "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law."  *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133,  870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  "The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492:  'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *Cherry* at ¶ 9.

{¶ 24}   In the case before us, B.C. was alleged to have committed a violation of R.C. 2925.03(A)(1), (C)(2)(a), which provides as follows:

(A) No person shall knowingly do any of the following:

(1) Sell or offer to sell a controlled substance or a controlled substance analog;

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

* * *

(2) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule III, IV, or V, whoever violates division (A) of this section is guilty of trafficking in drugs. The penalty for the offense shall be determined as follows:

(a) Except as otherwise provided in division (C)(2)(b), (c), (d), or (e) of this section, trafficking in drugs is a felony of the fifth degree, and division (B) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.

{¶ 25}    Thus, in order to establish a violation of the statute, the State had to prove that B.C. sold or offered to sell a controlled substance. R.C. 2925.01(A) provides that for purposes of Chapter 2925, "sale" has the same meaning as it does in R.C. 3719.01. Under R.C. 3719.01(A)(A), " '[s]ale' includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee."

{¶ 26}    In support of his argument, B.C. relies on *State v. Jacobozzi*, 6 Ohio St.3d 59, 451 N.E.2d 744 (1983), in which the Supreme Court of Ohio noted that " '[a]n appellate court will reverse a conviction based solely on circumstantial evidence where that evidence does not, as a matter of law, preclude all reasonable theories of innocence.' " *Id.* at 61, quoting *State v. Sorgee*, 54 Ohio St.2d 464, 377 N.E.2d 782 (1978), syllabus. According to B.C., there are other reasonable theories of innocence in the case before us. As examples, B.C. notes that Detective Orick failed to ask T.F. or B.C. if they were just "slapping hands in a friendly gesture," or whether B.C. had been giving money to T.F. to use his bicycle. In addition, B.C. contends that he told Orick that he had received $45 from having worked that day.

{¶ 27} The first two "theories" are not reasonable and do not fit the facts of the case. Specifically, Detective Halburnt testified that T.F. got off his bicycle and handed B.C. money. Halburnt saw T.F. with his hand "cupped up" after he handed the money to B.C., and saw B.C. hand something to T.F. In no way do these actions resemble "slapping hands in a friendly gesture." The money was also found on B.C. – not T.F. Consequently, B.C. could not have been paying T.F. for the use of his bicycle.

{¶ 28} As an additional matter, the assertion about Detective Orick's testimony misconstrues the testimony. Orick testified on cross-examination that he had not been led to believe that B.C. had received $45 from working that day.

{¶ 29} More importantly, however, the continued validity of *Jacobozzi* and *Sorgee* is questionable. In this regard, the Supreme Court of Ohio has stated that:

Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a factfinder. (Citations omitted.) *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492, *superseded on*

*other grounds by constitutional amendment*, as stated in *State v. Smith*, 80 Ohio St.3d 89, 103, fn. 4, 684 N.E.2d 668 (1997).

**{¶ 30}** Although *Jenks* did not specifically mention *Jacobozzi* and *Sorgee,* the Supreme Court has clearly rejected the theory expressed in those cases. *See State v. Lapping,* 75 Ohio App.3d 354, 360, 599 N.E.2d 416 (11th Dist.1991) (noting that *Jenks* reversed the position that the Supreme Court of Ohio had previously taken in *Sorgee*).

**{¶ 31}** After reviewing the record, we conclude that the State presented sufficient evidence to establish the sale of a controlled substance in violation of R.C. 2925.23(A)(1), (C)(2)(a). While conducting surveillance of a suspected drug dealer, the detectives saw the dealer engage in a hand-to-hand transaction with B.C., which involved the exchange of money for what appeared to be drugs. Moments later, the detectives also observed the same type of hand-to-hand transaction between B.C. and a third party, who was found in possession of narcotics. B.C. was also found in possession of cash. Shortly thereafter, the detectives found the same type of pills in the possession of the dealer who had exchanged money and items with B.C.

**{¶ 32}** In view of the small size of the items being passed, i.e., two pills, the quick and furtive nature of these types of transactions, and the distance that the detectives necessarily had to maintain from the suspects, the detectives did not have to testify that they had actually seen the pills themselves. A dependence on inferences "is the nature of circumstantial evidence and the legitimate object of its use." (Citation omitted.) *State v. Haldeman*, 2d Dist. Montgomery No. 18199, 2000 WL 1726858, * 3 (Nov. 22, 2000).

**{¶ 33}** Accordingly, " 'after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt.' " *Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, at ¶ 9, quoting *Jenks*, 61 Ohio St.3d at 259-260, 574 N.E.2d 492, paragraph two of the syllabus.

**{¶ 34}** B.C.'s First Assignment of Error is overruled.

### III.   Was B.C. Denied the Right of Confrontation?

**{¶ 35}** B.C.'s Second Assignment of Error states as follows:

Revised Code 2925.[51] as Written and Applied in the Instance [sic] Case Deprived Defendant of His Sixth Amendment Right to Confront Witnesses Against Him.

**{¶ 36}** Under this assignment of error, B.C. contends that R.C. 2925.51 violates a defendant's right to confront witnesses, because it allows lab reports to be submitted in lieu of the testimony of the lab analyst who submitted the report.   B.C. also contends that submission of the report involving B.C., in fact, violated B.C.'s rights.   According to B.C., the report should have specifically stated that the recipient would forfeit a fundamental constitutional right if he failed to submit a written demand for the analyst's testimony.

**{¶ 37}** R.C. 2925.51(A) allows prima-facie evidentiary weight to be given to laboratory reports regarding the content, identity, and weight, or the existence and number of unit dosages of alleged illegal substances.   In addition, the statute requires certain notarized statements to be attached to the report, verifying the identity and credentials of the individual signing the report.   The notarized statement must also verify that "scientifically accepted tests were performed with due caution, and that the evidence was handled in accordance with established and accepted procedures while in the custody of the laboratory."   *Id.*

{¶ 38}   R.C. 2925.51(B) also requires the prosecuting attorney to serve the report on the attorney of record, or on the accused if there is no attorney, "prior to any proceeding in which the report is to be used against the accused * * *."   In the case before us, there is no issue concerning the State's compliance with the statutory requirements.

{¶ 39}   As pertinent to this case, R.C. 2925.51 further provides as follows:

(C) The report shall not be prima-facie evidence of the contents, identity, and weight or the existence and number of unit dosages of the substance if the accused or the accused's attorney demands the testimony of the person signing the report, by serving the demand upon the prosecuting attorney within seven days from the accused or the accused's attorney's receipt of the report. The time may be extended by a trial judge in the interests of justice.

(D) Any report issued for use under this section shall contain notice of the right of the accused to demand, and the manner in which the accused shall demand, the testimony of the person signing the report.

{¶ 40}   In *State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, the Supreme Court of Ohio held that "[w]hen the state has complied with its obligations under R.C. 2925.51, a defendant's failure to use the procedures of R.C. 2925.51(C) to demand that a laboratory analyst testify constitutes a waiver of the opportunity to cross-examine the analyst at trial and allows the analyst's report to be admitted as prima facie evidence of the test results." *Id*. at paragraph two of the syllabus.

{¶ 41}   In addressing the wavier issue, the Supreme Court of Ohio observed that "[i]t is a well-established principle that Confrontation Clause rights, like other constitutional rights, can be waived."   (Citations omitted.)   *Id.* at ¶ 14.   The court then concluded that waiver was

appropriate in the case before it, because the report complied with the requirements of R.C. 2925.51 and provided notice of the consequences of a failure to demand testimony. *Id*. at ¶ 18-21.

{¶ 42} However, the court declined to consider whether the report, itself, was testimonial, because it was deciding the matter solely on the waiver issue. *Id*. at ¶ 12. The court commented that its prior decision in *State v. Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, "strongly supports the argument that the report is not testimonial." *Pasqualone* at ¶ 12. In addition, the court noted that the United States Supreme Court had previously accepted certiorari to consider the testimonial nature of a laboratory report. *Id.* at ¶ 12, fn. 4, citing *Melendez–Diaz v. Massachusetts,* 552 U.S. 1256, 128 S.Ct. 1647, 170 L.Ed.2d 352 (2008) (entry of March 17, 2008 granting writ of certiorari as case No. 07-0591). The Supreme Court of Ohio stressed, however, that a potential decision in *Melendez-Diaz* would not impact *Pasqualone*, due to the dispositive nature of the waiver issue. *Id*.

{¶ 43} B.C. notes the subsequent decision issued in *Melendez-Diaz*, and argues that R.C. 2925.51 violates the Confrontation Clause because it allows lab reports to be submitted in lieu of the testimony of a lab analyst. We disagree.

{¶ 44} In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the United States Supreme Court held that affidavits that report forensic analysis of material seized by the police fit "within the 'core class of testimonial statements' " covered by the Confrontation Clause. (Citation omitted.) *Id.* at 307 and 310. Among other things, the Supreme Court rejected the proposition that the defense's ability to subpoena an analyst precludes a violation. In this regard, the court stressed that:

Converting the prosecution's duty under the Confrontation Clause into the

defendant's privilege under state law or the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused. More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court. Its value to the defendant is not replaced by a system in which the prosecution presents its evidence via *ex parte* affidavits and waits for the defendant to subpoena the affiants if he chooses. (Emphasis sic.) *Id.* at 324-325.

{¶ 45}    These statements are consistent with the view expressed in B.C.'s brief, i.e., that the power to subpoena is not a substitute for the right to confront. While this is true, *Melendez-Diaz* also validated laws, like Ohio's, that allow for waiver. Specifically, the Supreme Court stressed that:

Perhaps the best indication that the sky will not fall after today's decision is that it has not done so already. Many States have already adopted the constitutional rule we announce today, while many others permit the defendant to assert (or forfeit by silence) his Confrontation Clause right after receiving notice of the prosecution's intent to use a forensic analyst's report, *id.*, at 13–15 (cataloging such state laws). Despite these widespread practices, there is no evidence that the criminal justice system has ground to a halt in the States that, one way or another, empower a defendant to insist upon the analyst's appearance at trial. (Footnote omitted.) *Id.* at 325-326.

{¶ 46}    The Supreme Court went on to note that:

The dissent finds this evidence "far less reassuring than promised." *Post*,

at 2557. But its doubts rest on two flawed premises. First, the dissent believes that those state statutes "requiring the defendant to give early notice of his intent to confront the analyst," are "burden-shifting statutes [that] may be invalidated by the Court's reasoning." *Post*, at 2554, 2557-2558. That is not so. In their simplest form, notice-and-demand statutes require the prosecution to provide notice to the defendant of its intent to use an analyst's report as evidence at trial, after which the defendant is given a period of time in which he may object to the admission of the evidence absent the analyst's appearance live at trial. See*, e.g.*, Ga.Code Ann. § 35–3–154.1 (2006); Tex.Code Crim. Proc. Ann., Art. 38.41, § 4 (Vernon 2005); Ohio Rev.Code Ann. § 2925.51(C) (Lexis 2006). Contrary to the dissent's perception, these statutes shift no burden whatever. The defendant *always* has the burden of raising his Confrontation Clause objection; notice-and-demand statutes simply govern the *time* within which he must do so. States are free to adopt procedural rules governing objections. See *Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). It is common to require a defendant to exercise his rights under the Compulsory Process Clause in advance of trial, announcing his intent to present certain witnesses. * * * There is no conceivable reason why he cannot similarly be compelled to exercise his Confrontation Clause rights before trial. *See Hinojos–Mendoza v. People*, 169 P.3d 662, 670 (Colo.2007) (discussing and approving Colorado's notice-and-demand provision). Today's decision will not disrupt criminal prosecutions in the many large States whose practice is already in accord with the Confrontation Clause. (Emphasis sic.) (Footnote omitted.) *Melendez-Diaz*,

557 U.S. at 326-327, 129 S.Ct. 2527, 174 L.Ed.2d 314.

**{¶ 47}** Based on the above discussion, we conclude that R.C. 2925.51 complies with the Confrontation Clause and does not impermissibly violate a defendant's Right of Confrontation. *Accord State v. Jackson*, 5th Dist. Richland No. 2012-CA-20, 2012-Ohio-5548, ¶ 57 (noting that "in *Melendez–Diaz*, the Court recognized that the procedure employed by R.C. 2925.51(C) adequately protects an accused's right of confrontation.")

**{¶ 48}** Despite the above case law, B.C. argues that the State must go beyond the minimal requirements of the statute, and mention specific consequences of failing to demand a witness' testimony. B.C.'s argument is based on *State v. Smith*, 3d Dist. Allen No. 1-05-39, 2006 -Ohio-1661. Again, while B.C.'s recitation of the law contained in *Smith* is accurate, *Smith* does not require a finding that the notarized statement provided to B.C. was insufficient.

**{¶ 49}** *Smith* was decided prior to *Pasqualone* and *Melendez-Diaz.* In *Smith,* the Third District Court of Appeals concluded that laboratory reports submitted under R.C. 2925.51 are testimonial. *Id*. at ¶ 11-16 (Citations omitted.) Nonetheless, the court concluded that the Right to Confrontation could be waived under R.C. 2925.51. *Id.* at ¶ 17. In this regard, the court stressed that:

> Ordinarily, waiver of the confrontation right before trial must be made knowingly, intelligently, and voluntarily. See *Boykin v. Alabama* (1969), 39 U.S. 238; *State v. Ballard* (1981), 66 Ohio St.2d 473, 423 N.E.2d 115. Thus, *the defendant must be fully informed as to the consequences of the waiver*. In this case we cannot say that the State's notice was adequate to fully inform the defendant as to the consequences of waiver under the statute. (Emphasis sic.) *Smith* at ¶ 21.

**{¶ 50}** In explaining the finding of inadequate notice, the Third District Court of

Appeals made the following observations:

> The notice provision in subsection (D) must be read in the context of the entire statute. * * * R.C. 2925.51(B) requires the prosecutor to serve a copy of the report "prior to any proceeding in which the report is to be used against the accused," and subsections (A) and (C) specifically define the circumstances under which the report can be used as prima facie evidence against the accused. Hence, the purpose of serving the report on the defendant and notifying him that he has a right to demand testimony is to inform him that the report will be offered into evidence against him without such testimony unless he makes such a demand.

> The State's notification, though fully compliant with R.C. 2925.51(D), makes no mention of the statute or of the consequences of waiver set forth in the statute; namely, that failure to make the demand will permit the laboratory report to serve as prima facie evidence of the conclusions in the report without the testimony of the technician. In fact, the State's notice in this case even fails to indicate that the laboratory report is evidentiary material, but rather couches it as a response to discovery. The demand requirement of R.C. 2925.51(D) does not indicate to the defendant that the report will serve as prima facie evidence unless a written demand for the technician's testimony is made. This notice is insufficient to fully inform the defendant of the consequences of failing to demand the witness's testimony, and without such notice the defendant cannot be said to have knowingly, intelligently, and voluntarily waived his constitutional rights. (Citation and footnote omitted.) *Smith*, 3d Dist. Allen No. 1-05-39, 2006-Ohio-1661, at ¶ 23-24.

**{¶ 51}** In contrast to *Smith*, the State's notification in the case before us referenced the statute and also indicated that failure to demand the testimony within seven days of receipt of the notice would "result in the report serving as prima facie evidence of its results." State's Exhibit A, p. 2. In fact, the notice conforms precisely to what the Third District Court of Appeals outlined in *Smith*. Accordingly, the State's notice was adequate to fully inform B.C. of the consequences of waiver under R.C. 2925.51.

**{¶ 52}** B.C.'s Second Assignment of Error is overruled.

### IV. Did B.C. Submit a Written Demand
### in Accordance With R.C. 2925.51(C)?

**{¶ 53}** B.C.'s Third Assignment of Error states as follows:

Defendant Submitted Written Demand in Accordance With the Statute and

Therefore Did Not Waive His Right to Confront the Lab Analyst.

**{¶ 54}** Under this assignment of error, B.C. contends that e-mails and conversations between his counsel and the State constituted sufficient notification of B.C.'s demand that the testimony of the lab analyst be presented. The State argues that B.C. admitted at the adjudicatory hearing that he had failed to submit a written demand in compliance with R.C. 2925.51. We agree with the State.

**{¶ 55}** As was noted, R.C. 2925.51(C) states that

The report shall not be prima-facie evidence of the contents, identity, and

weight or the existence and number of unit dosages of the substance if the accused

or the accused's attorney demands the testimony of the person signing the report,

by serving the demand upon the prosecuting attorney within seven days from the

accused or the accused's attorney's receipt of the report. The time may be extended by a trial judge in the interests of justice.

{¶ 56}   At the adjudicatory hearing, B.C. objected when the State moved to admit the lab report dealing with the drugs obtained from T.F.   At that point, the trial court asked B.C.'s counsel if he had filed the necessary paperwork to object to admission of the lab report.   In response, B.C.'s counsel said, "no."   Transcript of Proceedings, Volume II (December 5, 2011), p. 45.   Based on this admission, we conclude that B.C. waived the right to have the lab analyst testify.

{¶ 57}   In objections filed after the adjudicatory hearing, B.C. raised the argument that e-mails and discussion during the first-scheduled adjudicatory hearing in November 2011 had sufficiently asserted a demand for testimony.   However, the e-mails and discussion in question relate to the State's disclosure of the wrong lab report.   Specifically, the State had erroneously provided B.C. with a lab report pertaining to another case.

{¶ 58}   Because the State failed to disclose the proper report, the adjudicatory hearing was continued to December 5, 2011.   The State then provided B.C. with a copy of the correct lab report on November 4, 2011.   However, neither the e-mails sent to the State after that time nor the affidavit of B.C.'s counsel indicate that any written demand for testimony was ever submitted to the State in conjunction with the lab report given to B.C. on November 4, 2011.   See Conrad Affidavit and Exhibits attached to Docket #8 (Defendant's Response to State's Response to Supplemental Objections to Magistrate's Decision and Judge's Order).

{¶ 59}   Accordingly, even if we were inclined to disregard B.C.'s admission at the adjudicatory hearing (which we are not), B.C. failed to submit a timely written demand for testimony under R.C. 2925.51(C).   B.C., therefore, waived the right to require the lab analyst to

testify.

{¶ 60}    B.C.'s Third Assignment of Error is overruled.

V.   Did the Magistrate Err in Overruling B.C.'s Motion to Suppress?

{¶ 61}    B.C.'s Fourth Assignment of Error states that:

The Trial Court Erred in Denying the Suppression of the Currency Found

on Defendant During the Pat-Down.

{¶ 62}    Under this assignment of error, B.C. contends that the trial court erred in concluding that the search of B.C. took place incident to a valid arrest.  B.C. argues that Detective Orick conducted a pat-down search and did not arrest him until after multiple cruisers had arrived.  In addition, B.C. maintains that Orick exceeded the permissible scope of the pat-down search when he reached into B.C.'s pocket and extracted currency.

{¶ 63}    In response, the State maintains that B.C. waived his objection to the search by failing to file a motion to suppress prior to the adjudicatory hearing.  The State further argues that the detectives had probable cause to arrest B.C. and that the search was lawful, as   incident to the arrest.

{¶ 64}    Juv.R. 22(D) states that:

Any defense, objection or request which is capable of determination

without hearing on the allegations of the complaint may be raised before the

adjudicatory hearing by motion. The following must be heard before the

adjudicatory hearing, though not necessarily on a separate date:

* * *

(3) Motions to suppress evidence on the ground that it was illegally

obtained * * *.

**{¶ 65}**    Pursuant to Juv.R. 22(E)(1), prehearing motions to suppress must be filed seven days prior to the adjudicatory hearing.    However, Juv.R. 22(E) also states that "[t]he court for good cause shown may permit a motion to suppress evidence under division (D)(3) of this rule to be made at the time the evidence is offered."

**{¶ 66}**    In the case before us, B.C. did not file a motion to suppress prior to the adjudicatory hearing.    Moreover, he also did not object to the testimony about the search during Detective Orick's testimony.    In fact, B.C. waited until after the State rested to raise the suppression issue.    Even at that time, B.C. did not show good cause, let alone any cause, for failing to raise the issue earlier.    Under the circumstances, we conclude that B.C. has waived this issue, other than any plain error that occurred due to admission of the evidence.    *In re Lower*, 4th Dist. Highland No. 06CA31, 2007-Ohio-1735, ¶ 13.    (Citations omitted.)

**{¶ 67}**    "Crim.R. 52 allows plain errors to be recognized, stating that 'plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' "    *Id.*    "As defined by the Supreme Court of Ohio, plain error does not exist unless it is clear that but for the error, the jury's verdict would have been otherwise."    *Id.*, citing *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990). "Importantly, an appellate court should exercise the utmost caution when taking notice of plain error under Crim.R. 52(B), invoking the rule only in exceptional circumstances and only to prevent a miscarriage of justice."    *Lower* at ¶ 13, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

**{¶ 68}**    After reviewing the matter, we find no error, let alone plain error.    The testimony of Detective Orick indicates that he placed B.C. in custody when he took B.C. off the

bicycle after B.C. had initially failed to comply with an order to stop. Orick then placed B.C. in handcuffs. Orick also stated that in placing B.C. under arrest, he did a pat-down and discovered some cash. Transcript of Proceedings, Volume II (December 5, 2011), p. 41.

{¶ 69} We noted in *State v. Shipp*, 2d Dist. Montgomery No. 24933, 2012-Ohio-6189, that:

> One of the exceptions to the general prohibition against warrantless searches is a search incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). "When conducting a search incident to arrest, police are not limited to a *Terry* pat-down for weapons, but may conduct a full search of the arrestee's person for contraband or evidence of a crime." *State v. Gagaris*, 12th Dist. Butler No. CA2007-06-142, 2008-Ohio-5418, ¶ 16 (Citations omitted.) *See also State v. Jones*, 112 Ohio App.3d 206, 215, 678 N.E.2d 285 (2d Dist.1996).

> "If probable cause to arrest without a warrant exists prior to a search, it is immaterial that the search incident to arrest actually precedes the arrest. * * * The key is the prior existence of probable cause, and that the fruit of the search not provide the justification for the arrest." *State v. Haines*, 12th Dist. Clermont No. CA2003-02-015, 2003-Ohio-6103, ¶ 17. *Shipp* at ¶ 24-25.

{¶ 70} Previously, we have defined probable cause to arrest as follows:

> "Probable cause to arrest depends 'upon whether, at the moment the arrest was made * * * the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed

or was committing an offense.' " *Adams v. Williams* (1972), 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612, citing *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 * * * The existence of probable cause is determined by looking at the totality of the circumstances. *See Illinois v. Gates* (1983), 462 U.S. 213, 230-232, 103 S.Ct. 2317, 76 L.Ed.2d 527. *State v. Jones*, 183 Ohio App.3d 839, 2009-Ohio-4606, 919 N.E.2d 252, ¶ 15 (2d Dist.).

**{¶ 71}** At the moment Orick arrested B.C., the detectives had probable cause. The detectives had previously observed B.C. exchanging money and receiving something from a suspected drug dealer that the detectives had been monitoring for some time. In addition, the detectives observed B.C. receiving money and passing something to a third party almost immediately after the first suspected drug transaction. B.C. also initially refused to comply with an order to stop and had to be physically removed from the bicycle. Under the totality of the circumstances, the facts within the detectives' knowledge were sufficient to warrant a prudent person in believing that B.C. had committed an offense. Thus, Orick had probable cause for the arrest and was lawfully entitled to search B.C. incident to the arrest.

**{¶ 72}** B.C.'s Fourth Assignment of Error is overruled.

### VI.  Did the Trial Court Err in Ordering B.C. to Corrections Time More Than One Year After the Incident?

**{¶ 73}** B.C.'s Fifth Assignment of Error states that:

The Trial Court Erred in Ordering B.C. to Corrections Time More Than One Year After the Incident and Magistrate's Decision on Disposition Without Finding That It Was in the Best Interests of the Child or the Community.

{¶ 74}    Under this assignment of error, B.C. notes that a considerable period of time elapsed between the magistrate's disposition and the trial court's ruling on the objections.  B.C., therefore, contends that the trial court should have made factual determinations at the time of its decision about B.C.'s best interest and how the imposed sentence would achieve B.C.'s rehabilitative goals.

{¶ 75}    The complaint against B.C. was filed in September 2011, when B.C. was 17 years old.  B.C. filed objections to the magistrate's decision in December 2011, shortly after the adjudicatory hearing was held.  After the transcript was prepared, B.C. filed supplemental objections in March 2012, and also filed a response to the State's memorandum in May 2012. The trial court then rendered its decision in late January 2013, more than eight months later. Contrary to B.C.'s assertion, the trial court did not take more than a year to render a decision on the objections.

{¶ 76}    In support of his position, B.C. cites authority indicating that:

The juvenile court * * * must impose dispositions which are "reasonably calculated to achieve the overriding purposes set forth in [R.C. 2152.01], commensurate with and not demeaning to the seriousness of the delinquent child's * * * conduct and its impact on the victim, and consistent with dispositions for similar acts committed by similar delinquent children * * *." R.C. 2152.01(B). The "overriding purposes for dispositions" include providing for the care, protection, and mental and physical development of the delinquent child; holding the offender accountable for his actions; restoring the victim; and rehabilitating the offender.  R.C. 2152.01(A).  *In re J.P.*, 9th Dist. Summit No. 24538, 2009-Ohio-3974, ¶ 8.

**{¶ 77}** We see no evidence indicating that the trial court failed to comply with these requirements. In fact, B.C. received minimal sanctions for a crime that would be a fifth-degree felony if committed by an adult. B.C.'s sentence to DYS was suspended, contingent upon good behavior. In addition, 10 days of the 13-day corrections period were suspended, requiring B.C. to serve only one weekend in a local juvenile facility. These were not harsh punishments, and were reasonably calculated to rehabilitate B.C. while providing some impetus for his continued good behavior.

**{¶ 78}** B.C. also contends that the trial court was required to conduct a de novo review of the facts and to render an independent analysis of the issues. This is a correct statement of law. *See, e.g., In re N.M.*, 2d Dist. Montgomery No. 24110, 2010-Ohio-5048, ¶ 14. Again, however, we see no evidence that the trial court failed to conduct an independent review. The trial court's decision on the objections was quite lengthy and considered all the points that B.C. raised. Furthermore, B.C. has failed to provide authority indicating that the judge must conduct a further dispositional hearing after ruling on objections.

**{¶ 79}** Accordingly, B.C.'s Fifth Assignment of Error is overruled.


VII. Conclusion

**{¶ 80}** All of B.C.'s assignments of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .

HALL and YARBROUGH, JJ., concur.

(Hon. Steve A. Yarbrough, Sixth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.)

Copies mailed to:

Mathias H. Heck
Michele D. Phipps
Andrea M. Seielstad
Hon. Anthony Capizzi