Pfeifer, J.,
concurring in part and dissenting in part.
{¶ 291} I dissent from the imposition of the death penalty in this case. I would find under our independent sentence evaluation that the imposition of death is not appropriate for this defendant.
{¶ 292} I concur in the majority’s judgment affirming the defendant’s convictions, but disagree with the statements the majority makes regarding the admissibility of autopsy reports prepared by nontestifying medical examiners and regarding the admissibility of the testimony of surrogate medical examiners who rely upon the autopsy reports of nontestifying medical examiners. Ultimately, I concur in that part of the majority’s judgment that affirms the conviction because I believe that although both the admission of Dr. David Dolinak’s autopsy report into evidence and Dr. Joseph Felo’s testimony regarding Dr. Dolinak’s autopsy report violated defendant-appellant Charles Maxwell’s Sixth Amendment right to confrontation, the trial court’s errors were harmless beyond a reasonable doubt.
I
{¶ 293} In its landmark Confrontation Clause case, Crawford, v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States *71 Supreme Court held that the Confrontation Clause bars “testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination.” But the court left “for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ” Id. To some extent, we still await that clarifying day, especially in the area of autopsy reports; several state court decisions regarding the admissibility of autopsy testimony have been appealed to the United States Supreme Court, but to this point, the court has not granted certiorari on the issue. State v. Navarette, 2013-NMSC-003, 294 P.3d 435, cert, denied — U.S.-, 134 S.Ct. 64, 187 L.Ed.2d 254 (2013); State v. Joseph, 230 Ariz. 296, 283 P.3d 27 (2012), cert. denied, — U.S. -, 133 S.Ct. 936, 184 L.Ed.2d 733 (2013); State v. Mitchell, 2010-ME-73, 4 A.3d 478, cert, denied, — U.S.-, 133 S.Ct. 55, 183 L.Ed.2d 709 (2012). The nation, like this court, remains split on the question. But since Crawford, the court in cases like Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), Bullcoming v. New Mexico, 564 U.S.-, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), and Williams v. Illinois, — U.S.-, 132 S.Ct. 2221,183 L.Ed.2d 89 (2012), has provided enough guidance to establish that in most criminal cases, autopsy evidence is testimonial and implicates a defendant’s Sixth Amendment confrontation right.
A
Admission of the Autopsy Report

Melendez-Diaz

{¶ 294} I write today as the author of State v. Craig, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621. In Craig, this court held that an autopsy report prepared by a nontestifying medical examiner created no confrontation-right implications because it was a business record; the court in Crawford had indicated that business records are, “by their nature,” not testimonial. Crawford at 56. This court wrote:
An autopsy report, prepared by a medical examiner and documenting objective findings, is the “quintessential business record.” Rollins v. State (2005), 161 Md.App. 34, 81, 866 A.2d 926. “The essence of the business record hearsay exception contemplated in Crawford is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are ‘by their nature’ not prepared for litigation.” People v. Durio (2005), 7 Misc.3d 729, 734, 794 N.Y.S.2d 863.
*72 Craig, ¶ 82.
{¶ 295} However, the reasoning that an autopsy report is admissible as a nontestimonial business record was undone by Melendez-Diaz. The court held that the business-and-official-records hearsay exception does not permit an otherwise inadmissible testimonial statement to be admitted into evidence. Melendez-Diaz at 324. The court pointed out that although documents kept in the regular course of business are ordinarily admitted into evidence under the hearsay exception, they will not be admitted “if the regularly conducted business activity is the production of evidence for use at trial.” Id. at 321. The records may have had other purposes unrelated to their later use at trial, but if they were “ ‘made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,’ ” they are considered testimonial. Id. at 311, quoting Crawford at 52.
{¶ 296} The question of whether an objective witness who prepared an autopsy report would believe that that statement would be available for later use at trial is a difficult hurdle for the state to overcome in a case like this one, where the medical examiner autopsied a victim who was shot twice in the head. Any objective medical examiner would reasonably believe that an autopsy report that reflected the examination of a shooting victim would be available for use at a later trial. In the autopsy report admitted into evidence in this case, the cause of death on the front page of the report is listed as “Gunshot wounds of head. HOMICIDE.” Could a medical examiner who makes that conclusion believe anything other than that the report will be available for use at a later trial? He could not. But this court has distorted the applicable test.

“Primary Purpose” Test

{¶ 297} Every autopsy report is not, by definition, testimonial. At least one court has held that if a coroner did not contemplate at the time of the autopsy that criminal conduct had occurred, then the autopsy report is nontestimonial. United States v. James, 712 F.3d 79 (2d Cir.2013). The court in James, like the majority, employed a “primary purpose” test in evaluating the autopsy reports. Before James, the Second Circuit had held that “autopsy reports could be admitted as business records without violating the Confrontation Clause.” Id. at 87. Recognizing that recent precedents like “Melendez-Diaz and Bullcoming, and to a lesser extent Williams, call this categorical conclusion into doubt,” id. at 94, the court concluded that “a statement triggers the protections of the Confrontation Clause when it is made with the primary purpose of creating a record for use at a later criminal trial,” id. at 95-96.
*73 {¶ 298} Applying that test, the court held that testimony regarding a nontestifying coroner’s autopsy report in a case where foul play had not been suspected at the time of the autopsy did not implicate the Confrontation Clause. In James, multiple victims had died from poisoning. Dr. Corinne Ambrosi testified about an autopsy that was conducted on one victim, Basdeo Somaipersaud, by Dr. Heda Jindrak, who did not testify. The court concentrated on the fact that murder was not suspected by the medical examiner who prepared the report:
The defendants do not argue * * * that Somaipersaud’s autopsy was anything other than routine — there is no suggestion that Jindrak or anyone else involved in this autopsy process suspected that Somaipersaud had been murdered and that the medical examiner’s report would be used at a criminal trial. * * * The autopsy report itself refers to the cause of death as “undetermined” and attributes it both to “acute mixed intoxication with alcohol and chlorpromazine” combined with “hypertensive and arteriosclerotic cardiovascular disease.”
The autopsy was completed * * * substantially before any criminal investigation into Somaipersaud’s death had begun. During the course of Ambrosi’s lengthy trial testimony, neither the government nor defense counsel elicited any information suggesting that law enforcement was ever notified that Somaipersaud’s death was suspicious, or that any medical examiner expected a criminal investigation to result from it. Indeed, there is reason to believe that none is pursued in the case of most autopsies.
Id. at 98-99. Because of the nontestifying medical examiner’s lack of expectation of criminal involvement, the court concluded that “the autopsy report was not testimonial because it was not prepared primarily to create a record for use at criminal trial.” Id. at 99. The court concluded similarly about another victim’s toxicology report — there was no testimony that a criminal investigation was contemplated during the inquiry into the cause of death. Id. at 101.
{¶ 299} The majority applies the primary-purpose test in a very different way from the court in James. The majority does not conclude that the autopsy here was not part of a criminal investigation; it could not reasonably do so. Instead, it states the categorical conclusion that autopsy reports in Ohio in general “are created ‘for the primary purpose of documenting cause of death for public records and public health.’ ” Majority opinion at ¶ 57. That is, autopsy records are created so that we can have records. That makes no more sense than holding that the primary purpose behind the medical examiner’s autopsy report was that his boss told him to do it, or so that he could get paid for the week.
*74 {¶ 300} The majority does not explore why the state requires coroners to document causes of death in cases involving suspected violence. A coroner in Ohio is statutorily interconnected with Ohio’s criminal-justice apparatus. Pursuant to R.C. 313.12(A),
[w]hen any person dies as a result of criminal or other violent means * * * the physician called in attendance, or any member of an ambulance service, emergency squad, or law enforcement agency who obtains knowledge thereof arising from the person’s duties, shall immediately notify the office of the coroner of the known facts concerning the time, place, manner, and circumstances of the death * * *.
{¶ 301} Pursuant to R.C. 313.15, the coroner works with the prosecuting attorney and other law-enforcement officials to determine how long a dead body should remain in the coroner’s control; a coroner must keep possession of the body until he has decided that he no longer requires the body to determine the cause of death or until he has decided that law-enforcement officials no longer need the body to assist them with their duties
{¶ 302} Under R.C. 313.09, “[t]he coroner shall promptly deliver, to the prosecuting attorney of the county in which such death occurred, copies of all necessary records relating to every death in which, in the judgment of the coroner or prosecuting attorney, further investigation is advisable.”
{¶ 303} Pursuant to R.C. 313.10(A), autopsy records “shall be received as evidence in any criminal or civil action or proceeding in a court in this state, as to the facts contained in those records.”
{¶ 304} The coroner relies on law enforcement to provide information about suspicious deaths, consults with law enforcement on the preservation of evidence, and informs prosecuting attorneys when further investigation is advisable. It is not enough for the coroner to stamp “Homicide” on an autopsy report and file it neatly away. The coroner’s verdict establishes the starting point for a homicide investigation and eventual prosecution by determining a primary fact: a person has died by unnatural causes, not by his own hand.
{¶ 305} It is before that statutory backdrop that Dr. Dolinak received the victim’s body. She had suffered two bullet wounds to the head. Curtiss Jones of the Cuyahoga Coroner’s Office Trace Evidence and DNA Department testified that after the body was received and prior to the autopsy, evidence was collected to perform tests for gunpowder and trace metals and to evaluate blood and fingernail scrapings taken from the victim. Certainly, a reasonable medical *75 examiner in Dr. Dolinak’s position would have had to know that this case had criminal implications.
{¶ 306} In a case in which a coroner attests that the cause of death is homicide, the medical examiner knows at the time he or she attests to that statement that that report will be available for later use at trial. The level of detail involved with the autopsy process demonstrates that the primary purpose of an autopsy in a criminal case is potential prosecution. If only the fact of her death was relevant, why was trace evidence collected from the victim’s body before the autopsy? In James, the circuit court looked, as this court should, at the expectations of the coroner conducting the autopsy at the time — did the medical examiner anticipate that the case was a criminal one?
{¶ 307} Under the majority’s holding, a court would never look to the expectations of a reasonable medical examiner to determine primary purpose. The state has done his thinking for him — he may think he’s helping to solve a crime, but this court says that he is only trying to keep meticulous records. Under the majority opinion, no medical examiner ever creates an autopsy report for the primary purpose of creating a record to be used at trial. Instead, I would hold that whether a particular autopsy report is testimonial should be determined on a case-by-case basis.
{¶ 308} The majority decision is based entirely on the word “primary,” stating that “[f]or Sixth Amendment purposes, it is only the primary purpose of a document that determines whether it is testimonial or not.” (Emphasis sic.) Majority opinion at ¶ 62. I do not agree that the word “primary” deserves the artificial elevation that the majority gives it. It is not a part of the majority tests for expert-witness testimony in Melendez-Diaz or Bullcoming-, “primary purpose” is not the common thread in the Supreme Court’s jurisprudence on testimonial statements. James, 712 F.3d at 108 (Eaton, J., concurring). The primary-purpose test applies to police-interrogation cases like Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in which statements made to police by witnesses are evaluated by the declarant’s reason for making the statement. In Davis, which concerned whether statements made in a 9-1-1 call to police were testimonial, the court held:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*76
Id.

{¶ 309} I would hold that although the primary-purpose doctrine may apply to a lay witness who is in extremis at the time the statement is made, it does not apply to professionals regularly involved in creating statements used at trial. Instead, I favor the definition of “testimonial statement” as enunciated in Judge Eaton’s concurrence in James-. “[A] testimonial statement is one having an evidentiary purpose, declared in a solemn manner, and made under circumstances that would lead a reasonable declarant to understand that it would be available for use prosecutorially.” James, 712 F.3d at 108 (Eaton, J., concurring).
{¶ 310} Under that test, too, the autopsy report in this case would be considered testimonial.

Williams

{¶ 311} A consideration of the court’s separate opinions in Williams establishes that another possible justification for finding autopsy reports to be nontestimonial, that the autopsy report does not target a certain suspect, has been foreclosed. The court set forth the factual scenario at issue:
In petitioner’s bench trial for rape, the prosecution called an expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner’s blood. On direct examination, the expert testified that Cell-mark was an accredited laboratory and that Cellmark provided the police with a DNA profile. The expert also explained the notations on documents admitted as business records, stating that, according to the records, vaginal swabs taken from the victim were sent to and received back from Cellmark. The expert made no other statement that was offered for the purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample. Nor did the expert vouch for the accuracy of the profile that Cellmark produced.
Williams, — U.S.-, 132 S.Ct. at 2227,183 L.Ed.2d 89.
{¶ 312}' The lead opinion in Williams, which totaled just four supporters, offered two reasons why the expert’s statements were not testimonial. First, the out-of-court statements from the Cellmark report were related by the testifying expert solely for the purpose of explaining the assumptions on which the expert’s opinion relied — that the Cellmark result matched the state’s result — and were not offered for their truth. Id. at 2240-2241. That issue is discussed below in this *77 opinion’s analysis of the surrogate-testimony issue. Second, and more relevant to the issue of the admissibility of the autopsy report itself, the lead opinion concluded that even if the Cellmark report had been introduced for its truth, there would be no Confrontation Clause violation, because the statements did not involve “out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct.” Id. at 2242. The lead opinion explained:
Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the ISP lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time.
Id. at 2243.
{¶ 313} In my dissent in State v. Crager, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, a case involving the admission of a DNA test result performed by a nontestifying analyst, I attempted to distinguish the admissible autopsy report in Craig from a DNA test that I argued should not be admissible:
The Confrontation Clause “applies to ‘witnesses’ against the accused.” (Emphasis added.) Crawford, 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177. A coroner is concerned with how the decedent died rather than who may have killed him. Thus, the coroner is not a “witness” against a specific person when he or she prepares a report from an autopsy. A coroner’s report is not done at the behest of the prosecution in preparation for litigation; it is done pursuant to statute. See R.C. 313.131(B).
Crager, ¶ 107 (Pfeifer, J., dissenting).
{¶ 314} But one thing that emerged from the fractured court in Williams is that a majority of the court rejected the notion that test results are testimonial only if the testing targets a known suspect. Justice Thomas, who disagreed with both of the lead opinion’s rationales, but concurred in judgment, stated:
The new primary purpose test [from the Williams plurality opinion] asks whether an out-of-court statement has “the primary purpose of accusing a targeted individual of engaging in criminal conduct.” Ante, at 2242. That test lacks any grounding in constitutional text, in history, or in logic.
*78 Williams, — U.S. -, 132 S.Ct. at 2262, 183 L.Ed.2d 89 (Thomas, J., concurring in the judgment).
{¶ 315} Writing for the four justices in dissent, Justice Kagan stated:
[T]he plurality states that the Cellmark report was “not prepared for the primary purpose of accusing a targeted individual.” Ante, at 2248. Where that test comes from is anyone’s guess. Justice Thomas rightly shows that it derives neither from the text nor from the history of the Confrontation Clause. * * * And it has no basis in our precedents. We have previously asked whether a statement was made for the primary purpose of establishing “past events potentially relevant to later criminal prosecution” — in other words, for the purpose of providing evidence. Davis, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual.
Id. at 2273-2274 (Kagan, J., dissenting).
{¶ 316} The concurrence and dissent establish that a majority of the court rejects the idea that a diagnostic test is not testimonial if it does not target a specific individual.
B
Testimony by a Substitute Medical Examiner
{¶ 317} The majority makes the unremarkable statement that “the majority of jurisdictions that have examined this issue have concluded that a substitute examiner, on direct examination, may at least testify as to his or her own expert opinions regarding the autopsy and the victim’s death.” Majority opinion, ¶ 50. However, the testifying examiner is greatly restricted from revealing to the jury information from the autopsy report of the nontestifying preparer of the report. The testifying medical examiner in this case improperly introduced testimonial statements contained in the autopsy report prepared by the nontestifying medical examiner; he became a surrogate for the presentation of testimonial statements. Bullcoming
{¶ 318} In Bullcoming, — U.S.-, 131 S.Ct. at 2713, 180 L.Ed.2d 610, the court held that a scientific report could not be used as substantive evidence against the defendant unless the analyst who prepared and certified the report was subject to confrontation. “As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the *79 witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness.” Id. at 2713. The test in question was a blood-alcohol test involving a defendant charged with driving while intoxicated. The state attempted to enter the test results into evidence through the testimony of another analyst; the analyst who performed the test was unavailable because he was on unpaid leave for an undisclosed reason. The court rejected the surrogate testimony.
{¶ 319} The holding applies not just to the original analyst’s conclusions and opinions, but also to factual observations he or she may have generated:
Most witnesses, after all, testify to their observations of factual conditions or events, e.g., “the light was green,” “the hour was noon.” Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact — Bullcoming’s counsel posited the address above the front door of a house or the read-out of a radar gun. * * * Could an officer other than the one who saw the number on the house or gun present the information in court — so long as that officer was equipped to testify about any technology the observing officer deployed and the police department’s standard operating procedures? As our precedent makes plain, the answer is emphatically “No.”
Bullcoming at 2715.
{¶ 320} Therefore, as the court held in Commonwealth v. Phim, 462 Mass. 470, 479, 969 N.E.2d 663 (2012), a substitute medical examiner cannot testify as to statements of fact contained in an autopsy report:
Consistent with the Sixth Amendment and traditional protections against hearsay * * * a substitute medical examiner may not testify on direct examination to the facts, data, and conclusions stated in an autopsy report. * * * Accordingly, the prosecutor should not have elicited testimony on the description of the fatal wound contained in the nontestifying medical examiner’s files, or of the victim’s weight, height, and general physical condition.

Williams

{¶ 321} Nor can factual statements contained in an autopsy report be admitted into evidence as forming the basis of the substitute medical examiner’s expert testimony. Navarette, 2013-NMSC-03, 294 P.3d 435, ¶ 13 and 19. The court in *80 Navarette derived that conclusion from Williams, based upon the rejection by five members of the court in Williams of the lead opinion’s assertion that “an out-of-court statement that supports an expert witness’s opinion is not offered to prove the truth of the matter asserted, but is only offered as the basis for the expert’s opinion.” Navarette at ¶ 13. Justice Thomas’s concurrence and the dissent of Justice Kagan together establish that conclusion. Justice Thomas wrote that “statements introduced to explain the basis of an expert’s opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert’s opinion and disclosing that statement for its truth.” Williams, — U.S. -, 132 S.Ct. at 2257, 183 L.Ed.2d 89 (Thomas, J., concurring in the judgment). Justice Kagan wrote for the four dissenters:
[W]hen a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion,* * * the statement’s utility is then dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness’s conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is why the principal modern treatise on evidence variously calls the idea that such “basis evidence” comes in not for its truth, but only to help the factfinder evaluate an expert’s opinion “very weak,” “factually implausible,” “nonsense,” and “sheer fiction.” D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence § 4.10.1, pp. 196-197 (2d ed.2011); id., § 4.11.6, at 24 (Supp.2012).
Id. at 2268-2269 (Kagan, J., dissenting).

Dr. Felo’s Testimony

{¶ 322} In this case, at trial, Dr. Felo was encouraged by the state to review the autopsy report on the witness stand and to reveal the report’s findings to the jury. For instance, from the autopsy report, he related:
And on the external surface of her body were some — three identifying tattoos, some evidence of medical therapy, and two specific injuries of the head. Each of those injuries were gunshot wounds with one injury, one gunshot wound within the right eyebrow, and the second gunshot wound through the left ear and into the skull near the ear on the left.
He also testified as to the internal examination conducted by Dr. Dolinak:
*81 Specifically there was a broken portion of the skull where the right forehead and eye socket is, there was a tear going through the right eyeball, and then in the brain there was some evidence of some bleeding and bruising caused by the bullets going into the skull and striking the brain.
{¶ 323} The state also inquired regarding whether Dr. Dolinak had performed any microscopic evaluation of the body, and Dr. Felo responded, “Samples were examined underneath the microscope of the brain which documented the tears and bleeding of the brain caused by bullets going through the brain.”
{¶ 324} I would conclude that the admission of the information contained in the autopsy report prepared by Dr. Dolinak through Dr. Felo’s testimony violated Maxwell’s confrontation rights. The Sixth Amendment does not countenance surrogate testimony, nor does it allow the admission of testimonial statements prepared by nontestifying experts to serve as the basis of a testifying expert witness’s testimony.
{¶ 325} Just because the Confrontation Clause would not allow Dr. Felo to testify regarding Dr. Dolinak’s work does not mean that the Confrontation Clause would prohibit Dr. Felo’s testimony altogether. I agree with the court in Navarette that a substitute medical examiner could testify regarding certain materials within an autopsy file:
This is not to say that all material contained within an autopsy file is testimonial and therefore inadmissible. Without attempting to catalogue all material in a file that could be admissible, we note that an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause. * * * For example, in this case, after being shown the autopsy photographs, [the substitute medical examiner] expressed his own opinion about the entry and exit wounds, explaining the basis for his opinion. He did not simply parrot the opinion or subjective statement of the pathologist who performed the autopsy and took the photographs. Thus, he was available for cross-examination.
Navarette, 2013-NMSC-003, 294 P.3d 435, ¶22. In this case, too, Dr. Felo testified about his own conclusions regarding McCorkle’s wounds while viewing autopsy photographs. To that extent, his testimony was proper under the Confrontation Clause.
*82 c
Other Jurisdictions
{¶ 326} On the federal level, the Eleventh and D.C. Circuits, in United States v. Ignasiak, 667 F.3d 1217, 1231 (11th Cir.2012), and United States v. Moore, 651 F.3d 30, 72-73 (D.C.Cir.2011), have held that forensic pathology reports are testimonial for Confrontation Clause purposes.
{¶ 327} Further, at least eight state courts of last resort also find that autopsy reports are testimonial. State v. Locklear, 363 N.C. 438, 452, 681 S.E.2d 293 (2009); Navarette; State v. Kennedy, 229 W.Va. 756, 735 S.E.2d 905 (2012); Commonwealth v. Reavis, 465 Mass. 875, 992 N.E.2d 304 (2013); People v. Childs, 491 Mich. 906, 810 N.W.2d 563 (2012); Cuesta-Rodriguez v. State, 2010-OK CR 23, 241 P.3d 214 (2010), cert, denied — U.S.-, 132 S.Ct. 259, 181 L.Ed.2d 151 (2011); Wood v. State, 299 S.W.3d 200, 209-210, 214-215 (Tex.Crim. App.2009); State v. Lui, 179 Wash.2d 457, 315 P.3d 493 (2014).
II
Other Concerns
{¶ 328} The varied jurisprudence on the issue of the testimony of substitute medical examiners demonstrates that it is a recurring issue that demands resolution. Medical examiners die, they retire, and they move between jurisdictions. The nontestifying medical examiner who performed the autopsy in this case, Dr. Dolinak, is perhaps the poster child for the issue. In Wood, 299 S.W.3d 200, the tables were turned: Dr. Dolinak, since moved to Texas, testified instead of the medical examiner who conducted the autopsy. The Texas Court of Appeals held that Dr. Dolinak improperly revealed contents of the nontestifying medical examiner’s autopsy report in his testimony: “Under the circumstances of this case, the disclosure of the out-of-court testimonial statements underlying Dr. Dolinak’s opinions, even if only for the ostensible purpose of explaining and supporting those opinions, constituted the use of the testimonial statements to prove the truth of the matters stated in violation of the Confrontation Clause.” Id. at 213.
{¶ 329} Although the United States Supreme Court has not dealt squarely with the issue, in the corners and footnotes of Melendez-Diaz, the majority and dissenters frame the practical concerns about the admissibility or inadmissibility of autopsy reports. Writing for the four dissenters in Melendez-Diaz, Justice Kennedy mentions the autopsy report as the drum major in a parade of horribles created by the majority decision:
*83 [T]he range of other scientific tests that may be affected by the Court’s new confrontation right is staggering. See, e.g., Comment, Toward a Definition of “Testimonial”: How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Cal. L.Rev. 1093, 1094, 1115 (2008) (noting that every court post-Crawford has held that autopsy reports are not testimonial, and warning that a contrary rule would “effectively functio[n] as a statute of limitations for murder”).
Melendez-Diaz, 557 U.S. at 335, 129 S.Ct. 2527, 2546,174 L.Ed.2d 314.
{¶ 330} Justice Scalia, writing for the majority, addresses the dissenters’ claim that confrontation is not the only way to challenge forensic testing: “Respondent and the dissent may be right that there are other ways — and in some cases better ways — to challenge or verify the results of a forensic test.” Id. at 318. But the majority adds in a footnote, “Though surely not always. Some forensic analyses, such as autopsies and breathalyzer tests, cannot be repeated, and the specimens used for other analyses have often been lost or degraded.” Id. at fn. 5.
{¶ 331} These excerpts from Melendez-Diaz frame the concerns about autopsy reports. On the one hand, there is the concern that autopsy reports can last only as long as a preparer survives or stays within the jurisdiction. On the other hand, if the person who performed the autopsy is not available to testify, a defendant is powerless to rebut the findings of the one medical examiner who, in most cases, is the only person who will ever perform an autopsy on the victim in question.
{¶ 332} In my mind, the “statute of limitations on murder” belies the argument for autopsy reports being nontestimonial. If having no autopsy report available makes a murder conviction impossible, elevating an autopsy to a central role in a murder trial, does that not make it all the more imperative that a defendant have an opportunity to call into doubt the veracity of the report through cross-examination?
{¶ 333} In reality, in most cases, like this one, the autopsy report will not affect the trial in a meaningful way. But there are other cases in which autopsy testimony will be crucial. There are innumerable conclusions that a coroner could make in an autopsy report — cause of death, time of death, whether certain injuries are antemortem or postmortem, the presence of defensive wounds, evidence of rape, whether a baby was shaken — that can implicate or exonerate a defendant. Further, the determinations made in an autopsy are not mechanical. “Autopsies are also much more complex than the identification of a narcotic, and are more prone to shades of gray, as their outcome is a diagnosis, not a chemical compound match.” Tsiatis, Putting Melendez-Diaz on Ice: How Autopsy Re *84 ports Can Survive the Supreme Court’s Confrontation Clause Jurisprudence, 85 St. John’s L.Rev. 355, 383 (2011).
{¶ 334} “Medical examiners are not mere scriveners” and “autopsy reports are the product of the skill, methodology, and judgment of the highly trained examiners who actually performed the autopsy.” United States v. Ignasiak, 667 F.3d 1217, 1232 (11th Cir.2012). It is the diagnostic, subjective nature of autopsy reports that makes them especially appropriate for cross-examination:
The crux of the confrontation issue — the need to confront and cross-examine the attending forensic pathologist — is that forensic pathologists are physicians. Physicians exercise judgment and make mistakes, whether they treat living, breathing patients or perform forensic autopsies. Courts that have adopted the view that forensic autopsy reports simply memorialize objective data are misinformed. Neither forensic pathologists nor forensic autopsy reports are fungible. Forensic pathologists would not necessarily report the same findings if each were, hypothetically, able to perform the same autopsy.
Ginsberg, The Confrontation Clause and Forensic Autopsy Reports — A “Testimonial,” 74 La.L.Rev. 117, 168 (2013).
{¶ 335} The cross-examination of a surrogate is thus inadequate for a defendant:
The only vehicle by which a criminal defendant may explore the subjectivity involved in the performance of the forensic autopsy — to question the judgment of the examining forensic pathologist — is cross-examination. The in-court testimony of the surrogate forensic pathologist who examines the autopsy report prepared by the examining pathologist is an inadequate substitute. The surrogate witness is not the physician who was required to be familiar with the facts and the autopsy protocol, examine the victim’s body, perform the autopsy procedure, make and report findings, and report the cause and manner of death. The cross-examination of the surrogate yields very little. The surrogate can rely on the autopsy findings with impunity. There is simply little to be gained by the defendant in the effort to cross-examine the surrogate. Cross-examination is the great truth-seeking test, but it is an empty exercise when the surrogate testifies at trial.
*85 Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Saleh S. Awadallah, Matthew E. Meyer, Thorin 0. Freeman, Brian M. McDonough, and Adam M. Chaloupka, Assistant Prosecuting Attorneys, for appellee.
David L. Doughten and John P. Parker, for appellant.
Id. at 170.
{¶ 336} The point made by the court in Melendez-Diaz rings especially true with regard to autopsy reports: “Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well.” Melendez-Diaz, 557 U.S. at 319, 129 S.Ct. 2527, 174 L.Ed.2d 314. If other forensic tests implicate a defendant’s confrontation right, certainly an autopsy report should:
Both Bullcoming and Melendez-Diaz hold that a laboratory analyst’s report of sufficient solemnity triggers the protections of the Confrontation Clause. It would be incongruous indeed, if an autopsy report requiring numerous skilled judgments on the part of a medical examiner, did not require the same confrontation.
James, 712 F.3d at 111 (Eaton, J., concurring).
{¶ 337} The central question in the most serious of crimes is whether the victim involved suffered an unnatural death at the hands of another. The idea that a person who makes that determination is not subject to cross-examination is at direct odds with the Confrontation Clause.
Ill
{¶ 338} Ultimately, I agree with the majority that the admission of Dr. Dolinak’s autopsy report into evidence and Dr. Felo’s testimony regarding it constituted harmless error beyond a reasonable doubt. I therefore concur in the judgment of the majority as to Maxwell’s guilt. I dissent from the imposition of the sentence of death.
O’Neill, J., concurs in the foregoing opinion.